[No. B123079. Second Dist., Div. Four. Aug. 9, 1999.]

JAMES REAL, Plaintiff and Respondent, v.
CITY OF COMPTON, Defendant and Appellant.

1408

**COUNSEL**

Franscell, Strickland, Roberts & Lawrence, Cindy S. Lee and Jin S. Choi for Defendant and Appellant.

Wolfe & Wolfe and Bruce P. Wolfe for Plaintiff and Respondent.

**OPINION**

**EPSTEIN, J.—** This case arises under the Americans with Disabilities Act of 1990 (ADA) (42 U.S.C. § 12101 et seq.), which prohibits discrimination against any qualified individual with a "disability" as that term is defined in the statute. In addition to protecting individuals who suffer from a disability, the ADA also protects those who have a record of disability, and those who are wrongly regarded as being disabled when they are not. The definition of disability under the ADA is specific: it requires an impairment that substantially limits a major life activity. To succeed in a claim under the ADA, a plaintiff must show that he or she suffers from a disability (real or perceived) that falls within the ambit of the statute—that is, one that substantially limits a major life activity.

 In this case, the City of Compton (City) appeals from a judgment based on a jury finding that it perceived James Real, then a police officer employed by City, to be disabled within the meaning of the ADA. The appeal turns on whether Mr. Real proved that he was perceived to have an impairment that substantially limited a major life activity. Because there is no such evidence in the record, we conclude Mr. Real failed to satisfy this threshold requirement. Mr. Real is not a member of the class protected by the ADA. Accordingly, we reverse the judgment.

### FACTUAL AND PROCEDURAL SUMMARY

Mr. Real was a police officer with City's police department for 16 years. He worked almost exclusively as a patrol officer. In September 1989, Mr.

Real suffered pain in his left knee. The pain progressed, and eventually he was diagnosed as having a torn medial meniscus. In June 1990, Mr. Real underwent arthroscopic knee surgery, and was off work until November 1990.

Mr. Real's injury was work related. He filed a workers' compensation claim in July 1990. In conjunction with this claim, a physician, Dr. Paul Leonard, evaluated Mr. Real. Dr. Leonard found that, following the surgery, Mr. Real was "temporarily disabled and would benefit by further care." Dr. Leonard noted evidence of medial compartment degeneration. He concluded that Mr. Real was capable of desk work, office work, and other sedentary activities if allowed to return to work on that basis. However, the physician concluded, Mr. Real "will not be able to return to the field for at least another month or two, during which time he should be receiving some limited amounts of physical therapy to help improve range of motion, . . . I anticipate that there will be future problems and he will require long-term medical management. He would probably be at a stationary and permanent plateau for rating purposes in two months."[1]

In a second report Dr. Leonard stated that in November 1990 Mr. Real had resumed working and was doing fairly well, but had to be careful to avoid misstepping and prolonged standing. Based on a June 1991 examination, Dr. Leonard indicated that Mr. Real was making slow progress. "He continues to have to avoid any jarring, misstepping or twisting of the left knee. He has to also avoid prolonged standing. He has not been involved in any foot pursuit or major altercations. He does not feel that he can perform 100 percent in the field, but, working with a partner, he feels that he [is] safe, the partner is safe, and he presents no danger to himself or others while on duty in spite of this handicap of the knee. [¶] . . . He denies swelling, redness or heat of the knee, but, there is a sense of weakness, a tendency to buckle with sharp pain of the knee if he missteps, difficulty with squatting, and no urge to try running because of fear of lack of full control."

According to Dr. Leonard, Mr. Real suffered from "permanent residua[l] of trauma in the left knee with moderate instability of a combined type. He is stationary, permanent and ratable. He is working without restrictions. But would be handicapped in the open labor market to any job requiring repetitive squatting, stooping or kneeling, running and walking on broken

---

[1]The term "permanent and stationary" is used in the context of workers' compensation proceedings. (See Lab. Code, §§ 4061-4062.) "A disability . . . is permanent when the employee's condition has reached maximum improvement or the condition has become stationary for a reasonable period of time." (*Western Growers Ins. Co.* v. *Workers' Comp. Appeals Bd.* (1993) 16 Cal.App.4th 227, 235 [20 Cal.Rptr.2d 26].)

ground surfaces, repetitive climbing of ladders, or balancing on high tower situations."

In 1992, Mr. Real was involved in a car accident in which his left knee was re-injured. Mr. Real filed a workers' compensation claim after this accident, in which he stated that he had a permanent disability.

On December 31, 1992, Mr. Real saw Dr. Robert Hunt, an agreed medical examiner. Dr. Hunt's report is central to this case. According to the history included in the report, Mr. Real complained of a constant throbbing pain in his left knee. Dr. Hunt also reported that, "[a]t times there has been buckling and giving way of the left knee; however, this has not resulted in his falling." The report continued: "Such activities as prolonged sitting, standing and walking, kneeling and crawling, running and jumping, ascending and descending stairs, walking on inclined surfaces, bending and stooping, as well as any activity that requires him to bear weight on the left lower extremity, aggravates the left knee pain."

Dr. Hunt concluded that: "James Real is permanent and stationary from his injury said to have occurred over time, through 2/90. I believe that he achieved an essentially permanent and stationary status as of 12/1/90, six months post-surgery. From the date of the injury through 12/1/90, the patient would have been temporarily totally disabled while off work as a result of his injury, and temporarily partially disabled while working during that period of time. [¶] The patient has reasonable residual subjective complaints consisting of constant minimal-to-slight pain at the left knee, intermittently increasing to slight, and occasionally becoming moderate. [¶] *Based upon the patient's overall residual clinical status, I believe that he should observe prophylactic work restrictions precluding very heavy lifting, running, jumping, or climbing ladders, working on unprotected elevations, weightbearing for more than 1 1/2 hours without the opportunity to non-weightbear for 5-15 minutes, depending upon need, prolonged or repetitive kneeling, crawling, squatting, ascending or descending stairs, and walking on uneven or inclined surfaces.*" (Italics added.) Based on the same restrictions, the report stated that Mr. Real "was [in Dr. Leonard's report] considered handicapped in the open labor market . . . ."

Dr. Hunt's report also stated: "Assuming he continues to be able to work within the framework of prudent restrictions, from a purely orthopaedic standpoint, I see no reason why Officer Real should not be able to continue to work in his usual and customary employment as a police officer. Should he be unable to observe those restrictions, vocational rehabilitation services may be orthopaedically appropriate."

After receiving Dr. Hunt's report, Mr. Okonta, the workers' compensation claims coordinator for City, called Hourie Taylor, Chief of the Compton Police Department, and Captain Percy Perrodin of that department. Mr. Okonta also spoke to the City's risk manager, Charles Evans. Mr. Okonta told Chief Taylor that Dr. Hunt's report indicated that Mr. Real had to observe several restrictions. Mr. Okonta asked Chief Taylor to review the restrictions, "to determine whether Mr. Real can continue to work within the confines of that restriction." When asked whether the report indicated that Mr. Real was physically incapable of performing the restrictions listed under the prophylactic restrictions, Mr. Okonta responded "such language was not used specifically."

In February 1993, Mr. Evans, Captain Perrodin, Chief Taylor and Mr. Okonta met to discuss Mr. Real. Mr. Okonta asked Chief Taylor to consider whether Mr. Real could continue to be a police officer and avoid performing the activities included in Dr. Hunt's recommended prophylactic restrictions. Chief Taylor responded that he would review the positions in the department. Chief Taylor found no position that did not require the employee to engage in the activities listed in Dr. Hunt's prophylactic restrictions.

Mr. Okonta informed the Public Employees' Retirement System that Mr. Real could not perform certain functions medically, and recommended retirement. Mr. Okonta based his recommendation solely on Dr. Hunt's report. Mr. Okonta did not speak to Mr. Real or any of his coworkers to determine whether Mr. Real was properly performing his job. Nor did Mr. Okonta review Mr. Real's personnel file. Mr. Okonta determined that, based on the restrictions, it was impossible for Mr. Real to perform his usual and customary duties.

In February 1993, Mr. Okonta wrote Mr. Real, explaining that Dr. Hunt's report indicated that Mr. Real would not be able to return to work. Mr. Okonta stated that Mr. Real was eligible for a vocational rehabilitation evaluation. In April 1993, Mr. Real signed a stipulation in the workers' compensation proceeding which stated that he had a permanent disability of 42.2 percent in his lower left extremity. In June and July 1993, Mr. Real was sent a second letter stating that he might be eligible for vocational rehabilitation. On February 23, 1995, City sent Mr. Real a letter informing him that it would no longer pay him disability pension payments. In response, Mr. Real filed for disability retirement. Mr. Real received a disability retirement by which he receives half of his salary on a tax-free basis. Since his retirement from the police force, Mr. Real has found part-time work as a security guard.

Mr. Real argued before the Workers' Compensation Appeals Board (WCAB) that City violated Labor Code section 132a.[2] The WCAB found that "[t]here is no question that applicant [Mr. Real] has permanent disability due to industrial injuries and was terminated by the City." The WCAB further concluded that City did not act arbitrarily in retiring Mr. Real.

After receiving a right-to-sue letter from the Equal Employment Opportunity Commission (EEOC), Mr. Real filed suit under the ADA. At trial, Mr. Okonta testified that there were no permanent modified work assignments in which Mr. Real could be placed. Mr. Okonta also testified that his supervisor, Mr. Evans, had checked with other departments for open positions. Mr. Evans agreed, testifying that he had investigated to see if there were any vacant positions in City that Mr. Real could fill. He found two openings—a fire battalion chief position and a fire captain position. Mr. Evans did not believe that Mr. Real's training qualified him for either vacant position. Mr. Okonta also testified that he was concerned that if Mr. Real remained on the police force "the city will be exposed to additional liability . . . ."

Chief Taylor testified that the Compton police force includes 150 officers, 81 of whom are routinely assigned to patrol. He testified that Mr. Real could not function as a court officer because "the court officer is also required to do field duty. If an emergency arises, the field officer will be placed in patrol like any other uniformed patrol officer. The court officer is also expected, if police action is necessary, that he will be able to fully take whatever action is necessitated." He testified that a community affairs officer must also be able to complete police activity because "they work in uniform in a radio car. If they come upon a situation that requires police action, they take it." A helicopter observer must also be able to work patrol because that is what the officer does when there is inclement weather. According to Chief Taylor, Mr. Real could not work any position within the Compton Police Department because each requires that an officer work patrol twice a month. (The filing officer testified that he was required to work patrol once a month.)

Chief Taylor was asked: "Other than the fact that one of these positions we've been talking about, desk officer, community affairs, court officer

---

[2]Subdivision (1) of that statute provides: "Any employer who discharges, or threatens to discharge, or in any manner discriminates against any employee because he or she has filed or made known his or her intention to file a claim for compensation with his or her employer or an application for adjudication, or because the employee has received a rating, award, or settlement, is guilty of a misdemeanor and the employee's compensation shall be increased by one-half, but in no event more than ten thousand dollars ($10,000), together with costs and expenses not in excess of two hundred fifty dollars ($250). Any such employee shall also be entitled to reinstatement and reimbursement for lost wages and work benefits caused by the acts of the employer."

might have to take some police action, there's no reason Mr. Real couldn't have performed those functions; is that correct?" Chief Taylor responded: "That is incorrect. All of those positions are generally specialized assignments that you—there is a testing process that one has to take to be assigned to those positions." Chief Taylor testified that he did not think Mr. Real would want a civilian position because it carried a substantial cut in pay.

Chief Taylor testified that the restrictions in Dr. Hunt's report indicated that Mr. Real could not perform the requirements of a patrol officer. Chief Taylor also testified that he understood a prophylactic restriction to be "some type of physical restriction." Chief Taylor's deposition testimony concerning the meaning of "prophylactic" was read to the jury: "[I]f an individual does a physical activity with these restrictions, they could aggravate their injury." Chief Taylor agreed with counsel's definition that a prophylactic restriction did not mean that an individual could not perform the function, but that if he did it would aggravate the injury. Chief Taylor stated that he had not examined Mr. Real and does not personally "know what his physical abilities are." Based on the restrictions in Dr. Hunt's report, Chief Taylor concluded that if Mr. Real "performed the duties, he could cause himself injury and, of course, place himself in jeopardy or perhaps even some of the citizens or his co-workers in jeopardy."

Dr. Leonard testified that he believed Mr. Real could continue to perform his duties as police officer after the 1990 operation. Dr. Leonard pointed to Mr. Real's motivation to continue working.

Jasper Jackson, Mr. Real's partner, testified that Mr. Real appeared to be healed from his injury. He also testified that Sergeant Ron Malachi, a sergeant with a prosthetic leg, was unable to run and has trouble getting in and out of a patrol car quickly. Mr. Jackson testified that most policemen assist Sergeant Malachi.

Dr. Hunt testified that prophylactic work restrictions are "[w]ork restrictions [that] are given to a person to protect them from further injury to their affected body part to prevent them from needing additional medical care for worsening of their condition, for having to change their occupation, to need job retraining to do another job because of the persistence of these activities, it causes their condition to break down and deteriorate." The restrictions were given to Mr. Real to prevent further injury. Imposition of the prophylactic restrictions was based on Mr. Real's complaints to Dr. Hunt. Dr. Hunt would have altered the restrictions if Mr. Real had been able to complete those activities without complaints.

Judie Fogel, a vocational rehabilitation counselor, testified that Mr. Real was qualified to work within the department in nonpatrol positions. She also

testified that he had the skills necessary to work as a security guard, alarm operator, gate guard, surveillance system operator, or radio dispatcher.

In a special verdict the jury found that Mr. Real was not disabled as a result of a work injury; that he was regarded (perceived) as having an injury; City did not recommend that Mr. Real be retired because of an actual disability; City did recommend that Mr. Real be retired because of a perceived disability; City violated the ADA by retiring Mr. Real; City did not make reasonable efforts to accommodate Mr. Real; and Mr. Real suffered economic damages in the amount of $700,000 and noneconomic damages in the amount of $700,000. City filed a timely notice of appeal.

## DISCUSSION

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." (42 U.S.C. § 12112.) To establish a prima facie case of discrimination, a plaintiff must demonstrate that he or she (1) has a disability as defined by the ADA; (2) is a qualified individual; and (3) has suffered an adverse employment action because of the disability. (*Deane* v. *Pocono Medical Center* (3d Cir. 1998) 142 F.3d 138, 142.)

The ADA defines disability as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; [¶] (B) a record of such an impairment; or [¶] (C) being regarded as having such impairment." (42 U.S.C. § 12102(2).) "An employer runs afoul of the ADA when it makes an employment decision based on a physical or mental impairment, real or imagined, that is regarded as substantially limiting a major life activity." (*Sutton* v. *United Air Lines, Inc.* (1999) 527 U.S. 471, __ [119 S.Ct. 2139, 2150, 144 L.Ed.2d 450].) But, an employer may "decide that some limiting, but not substantially limiting, impairments make individuals less than ideally suited for a job." (*Ibid.*)

The jury found that Mr. Real was not actually disabled, but was regarded as being disabled. Mr. Real does not challenge the jury finding that he was not impaired. We focus our analysis on the third prong.

A person is "regarded as" disabled if: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." (527 U.S. at p. __ [119 S.Ct. at pp. 2149-2150].)

According to the EEOC,[3] the phrase "substantially limits" means: "(i) Unable to perform a major life activity that the average person in the general population can perform; or [¶] (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." (29 C.F.R. § 1630.2(j)(1) (1999).)

"Substantial limitation" is not synonymous with "utter inabilit[y]." (*Bragdon* v. *Abbott* (1998) 524 U.S. 624, 641 [118 S.Ct. 2196, 2206, 141 L.Ed.2d 540].) "When significant limitations result from the impairment, the definition is met even if the difficulties are not insurmountable." (*Ibid.*) But a "mere difference" in an individual's ability to perform a major life activity does not demonstrate a substantial impairment. (*Albertsons, Inc.* v. *Kirkingburg* (1999) 527 U.S. 555, __ [119 S.Ct. 2162, 2168, 144 L.Ed.2d 518].) "The impairment must be severe when compared to the functioning of the general population. The purpose of the ADA would be undermined if protection could be claimed by those whose relative severity of impairment was widely shared. [Citation.] On the other hand, Congress expressed a strong remedial intent in enacting the ADA, and explicitly found that approximately forty-three million Americans were disabled as of 1990, *see* 42 U.S.C. § 12101(a)(1) (1998), which implies that the definition should not be so restricted that only the most extremely impaired are covered." (*Taylor* v. *Pathmark Stores, Inc.* (3d Cir. 1999) 177 F.3d 180, 185-186.)

The EEOC has also codified a definition of major life activities. "Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." (29 C.F.R. § 1630.2(i) (1999).) Seeing, hearing, and walking have been held to be per se major life activities. (*Colwell* v. *Suffolk County Police Dept.* (2d Cir. 1998) 158 F.3d 635, 642.) Sitting, standing, lifting, and reaching also constitute major life activities. (29 C.F.R. pt. 1630, appen., § 1630.2(i) (1999).) Reproduction is a major life activity within the meaning of the ADA. (*Bragdon* v. *Abbott, supra,* 524 U.S. 624 [118 S.Ct. 2196].)

The United States Supreme Court recently found that including work as a major life activity created "some conceptual difficulty[.]" (*Sutton* v. *United*

---

[3]Under federal law, as under state law, an agency's construction of a statute it administers is entitled to substantial deference. (*Chevron U.S.A.* v. *Natural Res. Def. Council* (1984) 467 U.S. 837, 844 [104 S.Ct. 2778, 2782, 81 L.Ed.2d 694]; *Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 647 [335 P.2d 672].) The EEOC, however, has not been given authority to issue regulations concerning the generally applicable provisions of the ADA, which include the meaning of the term disability. (*Sutton* v. *United Air Lines, Inc., supra,* 527 U.S. 471, __ [119 S.Ct. 2139, 2145].)

*Airlines, Inc., supra,* 527 U.S. at p. __ [119 S.Ct. at p. 2151].) "[I]t seems 'to argue in a circle to say that if one is excluded, for instance, by reason of [an impairment, from working with others] . . . then that exclusion constitutes an impairment, when the question you're asking is, whether the exclusion itself is by reason of handicap.'" (*Ibid.,* quoting the transcript of oral argument in *School Bd. of Nassau County* v. *Arline* (1987) 480 U.S. 273 [107 S.Ct. 1123, 94 L.Ed.2d 307].) The court assumed without deciding that working constituted a major life activity when it considered an argument made by airline pilots that they were perceived as substantially limited in their ability to work. (*Sutton* v. *United Air Lines, Inc., supra,* 527 U.S. at p. __ [119 S.Ct. at p. 2151].) In *Sutton,* the petitioners were twin sisters, each suffering from severe myopia. Both were invited to interview for a pilot position. Their interviews were terminated after they were told that they did not meet a vision requirement set by United Air Lines. The two sisters alleged in their complaint that United Air Lines regarded their poor vision as a substantially limiting impairment. The court found this allegation insufficient to demonstrate that petitioners were included under the ADA's definition of disabled. "Because the position of global airline pilot is a single job, this allegation does not support the claim that respondent regards petitioners as having a substantially limiting impairment. See 29 C.F.R. § 1630.2(j)(3)(i) ('The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working'). Indeed, there are a number of other positions utilizing petitioners' skills, such as regional pilot and pilot instructor to name a few, that are available to them." (*Sutton* v. *United Air Lines, Inc., supra,* 527 U.S. at p. __ [119 S.Ct. at p. 2151].)

The high court adopted a similar approach in *Murphy* v. *United Parcel Service, Inc.* (1999) 527 U.S. 516 [119 S.Ct. 2133, 144 L.Ed.2d 484].) "[T]o be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job." (*Id.* at p. __ [119 S.Ct. at p. 2138].) The plaintiff in that case suffered from high blood pressure. For his position as a mechanic with United Parcel Service (UPS), he was required to drive a commercial motor vehicle. The Department of Transportation requires that the driver of a commercial motor vehicle not suffer from high blood pressure. UPS terminated the plaintiff because it believed he did not comply with the Department of Transportation regulation. The court found that the petitioner demonstrated that he was regarded as unable to work as a mechanic required to drive a commercial vehicle. He did not present any evidence that he was unable to work using his skills as a mechanic. It therefore affirmed summary judgment in favor of the employer. (*Id.* at p. 2139.)

In analyzing a challenge of sufficiency of the evidence, we interpret the evidence in the light most favorable to the judgment. (*Campbell* v.

*Southern Pacific Co.* (1978) 22 Cal.3d 51, 60 [148 Cal.Rptr. 596, 583 P.2d 121].) ▮ The parties agree that work constitutes a major life activity, and we assume the correctness of that proposition. Mr. Real bore the burden of showing that the City regarded him as precluded from more than one particular job. (*Murphy* v. *United Parcel Service, Inc., supra,* 527 U.S. at p. ___ [119 S.Ct. at p. 2135].) He was required to demonstrate that he was regarded as precluded from a broad class of jobs, such as the law enforcement field in general. (*Hughes* v. *Bedsole* (4th Cir. 1995) 48 F.3d 1376, 1388-1389 [interpreting Rehabilitation Act].)

The parties agree that City perceived that Mr. Real was unable to perform the functions of a patrol officer. This disqualified him from any position on the Compton police force because it was department policy that every officer be able to perform patrol duty once or twice a month. The fact that Mr. Real was terminated from a particular law enforcement agency is not sufficient to demonstrate that he was perceived as substantially limited in the major life activity of working. (*Colwell* v. *Suffolk County Police Dept., supra,* 158 F.3d at p. 647; *Papadopoulos* v. *Modesto Police Dept.* (E.D.Cal. 1998) 31 F.Supp.2d 1209, 1221.)

Mr. Real argues that the testimony of Mr. Okonta and Chief Taylor reveals that he was perceived as disqualified from a broad range of jobs. Specifically he focuses on the testimony by Mr. Okonta that "Mr. Okonta telephoned the Police Chief, Chief Taylor, and advised the Chief of the restrictions that Dr. Hunt had placed on Mr. Real. The discussion between Mr. Okonta and Chief Taylor centered around whether Mr. Real could still work as a police officer and not do the activities in the restrictions. Mr. Okonta also testified that there were no other positions within the entire city that he felt Mr. Real could perform, Further, Mr. Okonta testified that he made the decision to retire Mr. Real solely on the report of Dr. Hunt, and that in his opinion, Mr. Okonta felt that the restrictions placed on Mr. Real by Dr. Hunt made it impossible to perform his job." (Italics omitted.) Mr. Real also points out that Mr. Okonta testified City does not provide any type of modified work assignments on a permanent basis.

The fact that Mr. Okonta and Chief Taylor met to discuss Mr. Real's condition does not demonstrate that City perceived him as unable to perform a broad class of jobs. As Mr. Real himself states, the discussion centered around whether he was able to continue as a police officer. Nor does the fact that Mr. Okonta testified that there were no permanent modified work assignments in City's police force demonstrate that Mr. Okonta perceived Mr. Real as unable to perform a broad class of jobs.

If, as appellant states, Mr. Okonta had testified that Mr. Real was incapable of performing any position within City, that would be substantial

evidence that City perceived him to be incapable of performing a broad class of jobs and thus substantially limited in his ability to work. However, Mr. Okonta did not testify to that effect. He testified that his supervisor, Mr. Evans, checked with other departments to determine whether City had any vacant positions which Mr. Real could fill. The only vacant positions were a fire department battalion chief and a fire captain position. Mr. Evans concluded that Mr. Real was not qualified for either position, a conclusion that Mr. Real does not dispute. The fact that City perceived that Mr. Real was not qualified to serve as a fire battalion chief or fire captain does not demonstrate that he was perceived as unable to work in any law enforcement positions. To the contrary, evidence that City investigated other positions demonstrates that it believed Mr. Real might be able to serve City in a different capacity. Unfortunately, at the time there were no vacant positions for which Mr. Real was qualified.

Mr. Real also relies on Chief Taylor's testimony. In summarizing Chief Taylor's testimony, Mr. Real states: "Plaintiff presented evidence that two other doctors, Dr. Jacobs (the City doctor) and Dr. Leonard had released Mr. Real to return to work without restrictions, and Officer Jackson, Mr. Real's partner testified that Mr. Real did the job as a field police officer for over two (2) years, and that he never thought to have Ron Malachi medically evaluated." None of this evidence reflects Chief Taylor's perception of the extent of Mr. Real's impairment.

There is evidence that Chief Taylor was uncertain of the meaning of a "prophylactic" restriction when he evaluated whether there were any positions in City's police department which Mr. Real could fill. Chief Taylor testified that he thought a prophylactic restriction meant a physical restriction. This evidence supports a reasonable inference that Chief Taylor found Mr. Real to be physically restricted from engaging in activities required by officers of the police department. That is not the same as regarding Mr. Real to be disqualified from a broad class of jobs—the ADA standard. Chief Taylor also testified that the nonpatrol positions in the department required a testing procedure. He was not asked whether he believed Mr. Real would be successful on the test. Nor was Chief Taylor asked whether Mr. Real could fulfill a civilian position. He testified he thought Mr. Real would refuse such a position because it required a substantial decrease in pay. He did not suggest Mr. Real would be unable to perform that work. In summary, there is no testimony indicating that Chief Taylor perceived Mr. Real as substantially limited from a broad class of jobs.

In support of his argument, Mr. Real cites *Cochrum* v. *Old Ben Coal Co.* (7th Cir. 1996) 102 F.3d 908 and *Holihan* v. *Lucky Stores, Inc.* (9th Cir.

1996) 87 F.3d 362. Each case reached the circuit court after the district court had granted summary judgment. In *Cochrum*, an employee in a coal mine suffered from a work-related shoulder injury (an actual disability), and was ordered to follow several restrictions by his personal physician, one of which was that he not engage in "overhead or heavy lifting and no pushing or pulling out from his body." (102 F.3d at p. 910.) The court found that a factual dispute existed as to whether the employee was actually disabled. It reasoned that the shoulder condition could disqualify the employee from jobs at the mine as well as jobs in construction. (*Id.* at p. 911.) The most important distinction between *Cochrum* and the present case is that Mr. Real presented no evidence that he was perceived as disqualified from any position other than that of a Compton police officer.

*Holihan* involved both an actual and a perceived disability claim. In that case, the employer met with the employee to discuss aberrational behavior on two occasions. (*Holihan* v. *Lucky Stores, Inc., supra,* 87 F.3d at p. 366.) In addition, the employer had reports diagnosing the employee with depression, anxiety, and stress. The court concluded that a reasonable jury could infer the employer perceived that the employee suffered from a disabling mental condition that substantially limited his ability to work. (*Ibid.*) It reversed the grant of summary judgment. (*Id.* at p. 367.) But, unlike *Holihan*, there is no evidence that Mr. Real's condition as perceived by City was regarded as disqualifying him from a broad range of jobs.

Mr. Real appears to argue that City perceived him as substantially limited in his ability to walk or stand.[4] The prophylactic restrictions in Dr. Hunt's report included walking on uneven or inclined surfaces. There is no evidence that Mr. Okonta or Chief Taylor regarded Mr. Real as substantially limited in his ability to walk or stand. Nor was there evidence that either believed the inability to walk on an uneven or inclined surface constituted a substantial limitation.

Mr. Real also points out that he presented evidence that Sergeant Malachi remained on the City's police force even though he has a prosthetic leg. There also was evidence that other police officers felt compelled to aid Sergeant Malachi. This evidence is cited to demonstrate that City could have provided accommodations to Mr. Real similar to those afforded Sergeant Malachi. But "individuals who use prosthetic limbs or wheelchairs may be

---

[4]Mr. Real states: "The prophylactic restrictions placed on Respondent by Dr. Hunt included walking, and standing. As such, Respondent need not show that Defendant CITY OF COMPTON only perceived him as being unable to work in a specific job." It appears Mr. Real is arguing he was also perceived to be substantially limited in the major life activities of walking and standing.

mobile and capable of functioning in society but still be disabled because of a substantial limitation on their ability to walk or run." (*Sutton* v. *United Airlines, Inc. supra*, 527 U.S. at p. ___ [119 S.Ct. at p. 2149].) That determination must be made on an individual basis. (*Ibid.*) From the record before us, it is not shown whether Sergeant Malachi was disabled within the meaning of the ADA. If he was disabled, he was entitled to reasonable accommodations. It is clear, however, that Mr. Real is not disabled in this sense. Therefore, the issue of reasonable accommodations under the ADA is not implicated.

In summary, the evidence, viewed in the light most favorable to Mr. Real, does not show that City, acting through Mr. Okonta or Chief Taylor, perceived him as substantially limited in a major life activity. The fact that Mr. Real was perceived as unable to work as a Compton police officer does not show that he was perceived as precluded from a broad class of jobs. He has failed to demonstrate the elements of a prima facie case under the ADA.[5] Because there is insufficient evidence that Mr. Real is a member of the class protected by the ADA, the jury verdict based on a violation of the ADA cannot stand.

## DISPOSITION

The judgment is reversed. Appellant to have its costs on appeal.

Vogel (C. S.), P. J., and Curry, J., concurred.

Respondent's petition for review by the Supreme Court was denied November 10, 1999. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.

---

[5]In light of this finding, the other issues raised by City are moot.