[No. B134875. Second Dist., Div. Four. Dec. 5, 2000.]

LEANNE JENSEN, Plaintiff and Appellant, v.
WELLS FARGO BANK, Defendant and Respondent.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II and III.

## COUNSEL

Duchrow & Barker and David J. Duchrow for Plaintiff and Appellant.

Fisher & Phillips, James J. McDonald, Jr., and David A. Hosilyk for Defendant and Respondent.

## OPINION

**CURRY, J.**—Respondent Wells Fargo Bank obtained summary judgment on appellant Leanne Jensen's claims for violation of the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq., hereafter FEHA), discharge in violation of public policy, breach of contract, and breach of implied covenant of good faith and fair dealing. With regard to the FEHA claim, Wells Fargo persuaded the trial court (1) that the disability suffered by Jensen—posttraumatic stress disorder brought on by an attempted bank robbery—did not substantially limit her ability to participate in major life activities, and (2) that she had been reasonably accommodated, principally by being allowed to identify, from a company list of open job postings positions meeting her work restrictions and to compete for them

equally against other candidates. We reverse the trial court's grant of summary judgment as it pertains to the FEHA claim and remand.

### FACTUAL AND PROCEDURAL BACKGROUND

Jensen began working in banking right out of high school. Her second job was with United California Bank in 1980, and she continued with that company until it merged with First Interstate Bank. She worked for First Interstate until it, in turn, merged with Wells Fargo in 1996. During her career, Jensen worked as a teller, financial service representative, customer service representative, loan processor, assistant vice-president, and branch manager. All of her experience involved working with the public in a bank branch.

#### *The Bank Robbery*

On August 2, 1996, shortly after Jensen accepted a postmerger employment offer from Wells Fargo, she was the victim of an attempted robbery. As the branch manager, Jensen was the first employee to arrive at the bank that morning. Two robbers approached her as she placed her keys in the door, put a gun to her head, and ordered her to unlock the door. Once inside, she was told to disarm the alarm and open the vault and ATM (automated teller machine). When she said she did not have the combinations, the robbers repeatedly threatened to kill her, at one point tying her up, putting two guns to her head, and pulling the hammers back. After the assistant manager arrived, the robbers tried to use Jensen as bait to decoy her into coming inside. Fortunately, the assistant manager became suspicious and alerted the authorities.

During the robbery attempt, the robbers went through Jensen's purse. Finding her driver's license, they made a point of telling Jensen that they knew where she lived. When the police arrived, they arrested two people who were later tried and convicted. Jensen believes, however, that there were two others involved who have never been apprehended. After this ordeal, Jensen tried to return to her position, but found the situation too stressful. She stopped going to work in mid-August. Since that time, Jensen has received workers' compensation rehabilitation benefits and long-term disability benefits. She has not returned to work in any capacity.

#### *The Complaint*

On May 11, 1998, Jensen filed a complaint against Wells Fargo for violation of FEHA, discharge in violation of public policy, breach of written

contract, and breach of implied covenant of good faith and fair dealing. As amended, the FEHA claim alleged that, after the robbery attempt, Jensen was diagnosed as suffering from posttraumatic stress disorder, which, according to her psychiatrist, precludes her from working in a bank branch. The complaint alleged that Jensen has psychiatric symptoms which cause her to become anxious and fearful to a disabling degree when she has to interact with men who remind her of the robbers. According to the complaint, Jensen "made [Wells Fargo] aware of her disability"; "requested accommodation for her mental disability"; "applied for numerous transfers within the company, to different positions and to different locations, in order to maintain her employment"; and "located available positions which would accommodate her disability." But Wells Fargo informed her it had no " 'job available within [her] work restrictions.' " Jensen contended that this communication represented not just a violation of FEHA, but also a discharge in violation of public policy.

In the breach of contract and breach of implied covenant claims, Jensen alleged generally that her employment was governed by a series of writings and oral representations which Wells Fargo breached. The complaint does not describe these alleged writings and oral representations with any specificity.

*Wells Fargo's Summary Judgment Motion*

Wells Fargo moved for summary judgment. In its moving papers, Wells Fargo contended that Jensen's claims for breach of contract and breach of implied covenant of good faith and fair dealing failed because Jensen was an at-will employee. Wells Fargo presented evidence of a two-page employment offer signed by Jensen in May 1996 which stated that the employment, if she accepted it, would be at will.

Wells Fargo further contended that Jensen had never actually been terminated and pointed to the lack of any evidence that a representative of the bank had ever told Jensen orally or in writing that she was discharged. The statement of undisputed facts set forth evidence to establish that a Wells Fargo vice-president of human resources, Jean Dickten-Phillips, "was assigned to work with [Jensen] to find her a suitable position within [her work] restrictions within the Wells Fargo organization."[1] The statement further said that "Wells Fargo continues to send [Jensen] postings regarding open positions within the Wells Fargo organization" and that "Wells Fargo is still willing to work with [Jensen] to locate a suitable position within the Wells Fargo organization."

---

[1] Dickten-Phillips's declaration stated that she was instructed to discontinue contact with Jensen in May 1997.

Specifically with regard to the FEHA claim, Wells Fargo did not dispute that Jensen suffers from posttraumatic stress disorder or that it prevents her from returning to work as a branch manager or in a branch location. The statement of undisputed facts and the evidence supporting it contained no discussion of the nature or severity of Jensen's disorder other than to concede that it prevented her from working in a branch. Nor did Wells Fargo dispute that Jensen can work in other positions that do not involve working in a branch.

Much of the statement of facts consists of descriptions of a series of positions Jensen applied for over the years following the attempted robbery, and an explanation of why she was not selected for each position discussed. For example, paragraphs 17 and 18 of the statement of undisputed facts state: "[Jensen] applied for a Client Services/Rep Operations Wholesale Services position" and "[Jensen] did not have the required skills for the Client Services/Rep Wholesale Services position." Paragraphs 21 and 22 provide: "On December 9, 1996, [Jensen] applied for a posted Lease Servicing Consultant position" and "The Lease Servicing Consultant job was filled by two internal candidates who were current Wells Fargo employees previously working in the same department." Paragraphs 23 and 24 provide: "On December 9, 1996, [Jensen] applied for a posted Liquidation Specialist Position" and "The supervisor, Gordon Smith, sent [Jensen] a letter on January 15, 1997, that others with qualifications more closely matched his needs."

Evidence was also presented that Jensen "refused a courtesy interview in the trust department," "told Jean Dickten-Phillips that she was afraid of sales, customers, etc., and that she needed an 'office environment'" when Dickten-Phillips attempted to interest her in a human resources opening in April 1997, and "refused a temporary research position in El Monte/Retail General Lending Operations." The statement of undisputed facts states that Dickten-Phillips "looked into" a position in the Pasadena office, but because it was above a branch and customers occasionally went upstairs, rejected it. The statement attributes the following to Jensen: "[She] said she could not or would not: 1) visit a branch office; 2) perform a sales job; 3) work in certain geographic areas, including El Monte; 4) work in a non-office environment; 5) take a job for less than she was previously earning; 6) accept a temporary position."[2]

---

[2]Dickten-Phillips stated in her declaration that Jensen's doctor reported she could not work in a branch. Jensen reportedly told Dickten-Phillips that she could not perform in any position that required her to visit a branch banking office, could not be assigned to a sales job, could not work in specific geographic areas, and did not want to speak with departmental managers

*Jensen's Opposition*

Jensen's opposition to the summary judgment motion was primarily supported by her own declaration. In it, she stated that immediately after the robbery, she returned to work for a few partial days before she completely stopped going. In discussions with her supervisor, she asked if it would be possible for her to have an assistant, but did not receive a response. She was told on August 14 that another person would be acting as branch manager in her absence. At some point in August or September, she was told she was being replaced as branch manager, but that Wells Fargo would find an alternate branch if she wanted to come back to work. Her supervisor reportedly told her she could return to work only if she had a doctor's release which, due to her condition, was never forthcoming.

Jensen stated that once the decision was made to seek reassignment to a nonbranch position, she had difficulty obtaining the bulletin which contained Wells Fargo's open position listings and repeatedly had to call to remind someone to mail her a copy. In November 1996, she spoke with human resources manager Lynn Secrest about a posted job in client services in which she was interested. She was later informed she did not have the technical skills the job required. Secrest got her an interview for an unposted job in the cash management department. During the interview, she was told they wanted someone with cash management experience. In December 1996, she applied for the position of lease servicing consultant. She received no follow-up from anyone.

Jensen had her first contact with Dickten-Phillips in March 1997. Jensen sent Dickten-Phillips a list of six jobs she was interested in obtaining and which she felt she could handle with restrictions. No interviews resulted from that contact. In March and April, Jensen applied on her own for jobs as a customer services representative in Long Beach, a trust associate, and a loan administrator. She never received interviews for any of these positions and was never told why not. Also in April, with the assistance of Dickten-Phillips, Jensen applied for the position of compliance representative. She was later informed that that position was no longer being offered. In April, Jensen was offered a temporary job in El Monte intended to last three months, which she turned down.

In June 1997, Jensen applied, at Dickten-Phillip's suggestion, for a human resources position in El Monte with a shift that ended at 1:00 a.m. Jensen

regarding her skills and qualifications when there was not an actual job opening because it made her anxious and just got her hopes up. The fact that Jensen would not take a job for less than she was previously earning was supported by Jensen's response to the following question asked at her deposition: "What salary were you looking for when you began looking for an alternative job at Wells Fargo?" She replied: "Approximately the same salary that I was receiving."

admitted she was nervous about the thought of walking through the parking lot to get to her car at that hour and was concerned about other employees becoming upset with her in that position. She later received word that she was no longer being considered for the position.

In September 1997, Jensen was assigned to a new coordinator, Susan Price. She left messages with Price about a position she was interested in, but received no return calls. She did not hear from anyone at Wells Fargo again until after filing this lawsuit in May 1998.

Jensen denied telling anyone at Wells Fargo that she had to have a position which paid the same as branch manager, and pointed out that some of the positions she applied for paid a lower salary. She also denied refusing to interview with the trust department or refusing to work in certain geographical locations. She admitting not wanting to interact with the public or strangers in person or to go to unfamiliar locations to develop and generate sales leads.

Jensen stated that as a result of the robbery, she suffers from anxiety, nervousness, depression, lack of confidence, a helpless feeling, and a feeling of humiliation. She has headaches, grinds her teeth, and has nightmares and trouble sleeping. She also suffers panic attacks. She maintains that due to her condition, she is unable to work at any job in a bank branch location or one that involves working with the public or with cash. She stated she would prefer, but "do[es] not absolutely require," working during daylight hours, where parking is secure, where someone can accompany her to her car, and where there is a private place where she can go if she suffers a panic attack.

The trial court granted the motion for summary judgment. The court explained in its order that Wells Fargo was entitled to summary adjudication on the FEHA claim on three grounds: (1) "[Wells Fargo] offers evidence that [Jensen's] doctor released her to resume work in a capacity other than in a branch or an in-store branch [citation], showing that [Jensen's] Posttraumatic Stress Disorder ('PTSD') and depression did not substantially limit a major life activity . . ."; (2) "[Wells Fargo] offers evidence that [Jensen] is unable to perform the essential functions of her original job as a branch manager [citations] and that [Jensen] was unable to perform the essential functions of any of the alternate jobs she sought, with or without reasonable accommodation [citations]"; (3) "[Wells Fargo] offers evidence that it never told [Jensen] that her employment was terminated [citation], [Wells Fargo] continued to assist [Jensen] in searching for other jobs within [Wells Fargo's] organization [citations], and [Wells Fargo] remains willing to help [Jensen] return to work [citations]."

With regard to the other claims, the court agreed that there was no evidence to establish that Jensen had been discharged and that the agreement signed by Jensen made her an at-will employee. Appeal was taken from the judgment entered.

## DISCUSSION

## I

## FEHA CLAIM

A defendant meets its burden on a motion for summary judgment or summary adjudication by proving that one or more elements of a cause of action alleged in the complaint cannot be established, or that there is a complete defense to that cause of action. (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46]; see Code Civ. Proc., § 437c, subd. (o)(2).)

 In support of its contention that Jensen was unable to establish any of the essential elements of a FEHA claim, Wells Fargo referred to the elements set forth in *Brundage v. Hahn* (1997) 57 Cal.App.4th 228 [66 Cal.Rptr.2d 830]. In *Brundage*, the court stated that a disabled claimant bringing suit under the FEHA "can establish a prima facie case by proving that: (1) plaintiff suffers from a disability; (2) plaintiff is a qualified individual;[3] and (3) plaintiff was subjected to an adverse employment action because of the disability. [Citation.]" (*Id.* at p. 236, fn. omitted.) This does not mean that the plaintiff must prove a causal connection between the disability and the adverse employment action by direct evidence. The court acknowledged that the plaintiff can establish the latter element for purposes of a wrongful discharge or adverse employment action claim by showing that " 'he or she was subject to an adverse employment action' " and that " 'he or she was replaced by a non-disabled person or was treated less favorably than non-disabled employees.' [Citation.]" (*Id.* at p. 236, fn. 1,

---

[3]The term "qualified individual" comes from the federal Americans with Disabilities Act (42 U.S.C. § 12101 et seq., hereafter ADA) which defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." (*Id.*, § 12111(8).) The ADA defines "disability" to include "a physical or mental impairment that substantially limits one or more of the major life activities of such individual[.]" (*Id.*, § 12102(2)(A).) As we will see, the FEHA does not follow this definition of disability verbatim, so that a "qualified individual" for purposes of the FEHA can be different from a "qualified individual" for purposes of the ADA.

quoting *Taylor v. Principal Financial Group, Inc.* (5th Cir. 1996) 93 F.3d 155, 162.)[4]

The plaintiff in *Brundage*, a woman suffering from manic depression, was allegedly terminated for failing to come back to work after taking leave and being absent without permission or explanation. The primary issue in *Brundage* was whether the employer's asserted basis for termination was pretextual. The claim in *Brundage* thus arose under Government Code section 12940, subdivision (a), which provides that it is an unlawful employment practice "[f]or an employer, because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, or sexual orientation of any person, to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment." The employer established that it had no knowledge of the plaintiff's disability prior to the termination, and prevailed on summary judgment.

The elements set forth in *Brundage* apply to a Government Code section 12940, subdivision (a) employment discrimination case, where an employee or prospective employee who is fully qualified and able to perform the functions of a particular position is terminated from the position or not hired for it in the first place, and the suspected reason is the employee's membership in one of the listed classifications. In that situation, the courts agree that it is the plaintiff's responsibility to prove that he or she is a member of a protected class set forth in FEHA (such as a person with a disability); that he or she is qualified to perform the duties of the position (with or without reasonable accommodation in the case of a disability claim); and that he or she was subject to adverse employment action or not hired because of the disability or membership in another class described in FEHA. (See, e.g.,

[4]This is in line with United States Supreme Court authority holding that a member of a protected group establishes a prima facie case for employment discrimination for failure to hire by presenting evidence that, despite possessing the requisite qualifications, he or she was rejected, and that, after that rejection, the position remained open and the employer continued to seek applicants from persons with complainant's qualifications. (*McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802 [93 S.Ct. 1817, 1824, 36 L.Ed.2d 668].) In *Mixon v. Fair Employment & Housing Com.* (1987) 192 Cal.App.3d 1306 [237 Cal.Rptr. 884], the court held that a prima facie case for discriminatory discharge is established through evidence of the following: "(1) complainant belongs to a protected class; (2) his job performance was satisfactory; (3) he was discharged; and (4) others not in the protected class were retained in similar jobs, and/or his job was filled by an individual of comparable qualifications not in the protected class." (*Id.* at p. 1318; accord, *Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 197 [48 Cal.Rptr.2d 448].)

*Deschene v. Pinole Point Steel Co.* (1999) 76 Cal.App.4th 33, 44 [90 Cal.Rptr.2d 15] [employee with diabetes and heart condition terminated after incidents of insubordination]; *Pensinger v. Bowsmith, Inc.* (1998) 60 Cal.App.4th 709, 719 [70 Cal.Rptr.2d 531] [employee with developmental reading disorder terminated from position as sales representative after refusing to take reading evaluation tests].)

■ Jensen's claim is different. Her claim falls under Government Code section 12940, subdivision (k), which makes it an unlawful employment practice "[f]or an employer or other entity covered by this part to fail to make reasonable accommodation for the known physical or mental disability of an . . . employee." Since her ordeal, Jensen has concededly been unable to perform the usual functions of branch manager, the position for which she was qualified and in which she was employed until August 1996. The question here is whether Wells Fargo failed to reasonably accommodate her in accordance with subdivision (k); specifically, whether Wells Fargo failed to accommodate her by "reassignment to a vacant position," one of the methods of "reasonable accommodation" specified in the statutory definition, Government Code section 12926, subdivision (n)(2).[5]

■ The elements of a failure to accommodate claim are similar to the elements of a Government Code section 12940, subdivision (a) discrimination claim, but there are important differences. The plaintiff must, in both cases, establish that he or she suffers from a disability covered by FEHA and that he or she is a qualified individual. For purposes of a section 12940, subdivision (k) claim, the plaintiff proves he or she is a qualified individual by establishing that he or she can perform the essential functions of the position to which reassignment is sought, rather than the essential functions of the existing position. (See, e.g., *Smith v. Midland Brake, Inc.* (10th Cir. 1999) 180 F.3d 1154, 1161-1162; *AKA v. Washington Hosp. Center* (D.C. Cir. 1998) 156 F.3d 1284, 1300-1301 [332 App.D.C. 256].) More significantly, the third element discussed in *Brundage*—establishing that an "adverse employment action" was caused by the employee's disability—is irrelevant to this type of claim. Under the express provisions of the FEHA, the employer's failure to reasonably accommodate a disabled individual is a violation of the statute in and of itself. (Gov. Code, § 12940, subd. (k).) With these differences in mind, we turn to the evidence set forth in the summary

---

[5]Government Code section 12926, subdivision (n) provides: " 'Reasonable accommodation' may include either of the following: [¶] (1) Making existing facilities used by employees readily accessible to, and usable by, individuals with disabilities. [¶] (2) Job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities."

judgment motion to test whether Wells Fargo succeeded in negating an essential element of Jensen's FEHA claim.

A

*Existence of Disability*

 Wells Fargo first sought to persuade the court that Jensen's condition—posttraumatic stress disorder—did not meet the statutory definition of disability as a matter of law. Wells Fargo relied on *Muller v. Automobile Club of So. California* (1998) 61 Cal.App.4th 431 [71 Cal.Rptr.2d 573], which held that a mental disorder does not meet the FEHA definition of disability unless it "substantially limits a major life activity." (*Id.* at p. 443, fn. omitted.) The court reached this conclusion by borrowing from the statute's definition of *physical* disability, which states that a physical condition does not qualify as a disability unless it " '[l]imits an individual's ability to participate in major life activities.' " (*Id.* at p. 440, quoting Gov. Code, § 12926, subd. (k)(1)(B).) The court recognized that the FEHA definition of mental disability did not contain that phrase or anything like it, but concluded it was a "legislative oversight." (*Muller*, at p. 443, fn. 6.) The court in *Muller* imported part of its definition from the ADA, which states that the disability must "*substantially* limit[] one or more of the major life activities . . . ." (42 U.S.C. § 12102(2)(A), italics added; see *Muller*, at p. 440.) Subdivision (k)(1)(B) of section 12926 of the Government Code, the definitional provision for FEHA, states that physical disability includes a disease, disorder, condition, etc., that "[l]imits an individual's ability to participate in major life activities." The term "substantially" does not appear. The court disagreed with a contrary holding in *Pensinger v. Bowsmith, Inc., supra,* 60 Cal.App.4th 709, in which the court, finding no ambiguity, declined to look beyond the plain language of the statute. (*Muller*, at p. 443, fn. 6.)

Recently, this court expressed its agreement with *Pensinger* and disagreement with *Muller* in *Swenson v. County of Los Angeles*\* (Cal.App.). Our decision in that case is currently on review before the Supreme Court. Until the Supreme Court expresses a contrary decision, we shall continue to adhere to our conclusion that the plain meaning of the language used in the FEHA's definition of mental disability, and the absence of any potential absurd result from following the plain language, require us to follow the Legislature's language and give a broader meaning to mental disability than to physical disability.

We are further persuaded of the erroneousness of the decision in *Muller* by a recent amendment to the FEHA signed by the Governor on September 30,

*\*Reporter's Note: Review granted January 13, 2000 (S083916). On January 24, 2001, review dismissed and cause remended to Court of Appeal, Second Appellate District, Division Four.*

2000. (See Stats. 2000, ch. 1049.) The Legislature added a new Government Code section 12926.1, which contains its findings and declarations. Section 12926.1, subdivision (c), explains: "[T]he Legislature has determined that the definitions of 'physical disability' and 'mental disability' under the law of this state require a 'limitation' upon a major life activity, but do not require, as does the Americans with Disabilities Act of 1990, a 'substantial limitation.' This distinction is intended to result in broader coverage under the law of this state than under that federal act." (Stats. 2000, ch. 1049, § 6.) The new provision goes on to state: "[U]nder the law of this state, 'working' is a major life activity, regardless of whether the actual or perceived working limitation implicates a particular employment or a class or broad range of employments. [¶] . . . Notwithstanding any interpretation of law in Cassista v. Community Foods (1993) 5 Cal.4th 1050 [22 Cal.Rptr.2d 287, 856 P.2d 1143] [which held that federal interpretations of the ADA were useful guides to the construction of the FEHA], the Legislature intends (1) for state law to be independent of the Americans with Disabilities Act of 1990, (2) to require a 'limitation' rather than a 'substantial limitation' of a major life activity . . . ." (Stats. 2000, ch. 1049, § 6; Gov. Code, § 12926.1, subds. (c) & (d).) Assuming this represents a legislative attempt to clarify the existing statute, it would apply to cases which predate its passage. (See *Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 243-244 [62 Cal.Rptr.2d 243, 933 P.2d 507] [" ' "An amendment which in effect construes and clarifies a prior statute must be accepted as the legislative declaration of the meaning of the original act, where the amendment was adopted soon after the controversy arose concerning the proper interpretation of the statute." ' " (Quoting *RN Review for Nurses, Inc. v. State of California* (1994) 23 Cal.App.4th 120, 125 [28 Cal.Rptr.2d 354], fn. omitted.)]

Moreover, even were we to agree with Wells Fargo that the definition of mental disability should be limited as stated in *Muller* and the ADA, Wells Fargo failed to meet its burden as a defendant moving for summary judgment in establishing that Jensen's disability was insufficient to limit her ability to substantially participate in major life activities. The court in *Muller* did not hold that posttraumatic stress disorder cannot, as a matter of law, meet that test. It merely held that where a federal district court, after "carefully review[ing]" the evidence, concluded that plaintiff's psychological impairment " 'was of limited duration and did not substantially limit a major life activity' " in connection with a claim brought under the ADA, that finding collaterally estopped her from raising the same issue in front of the state court. (*Muller v. Automobile Club of So. California, supra,* 61 Cal.App.4th at p. 443.) Federal courts that utilize the more restrictive definition of mental disability advocated by Wells Fargo, have held that plaintiffs suffering from cases of posttraumatic stress disorder may be able

to state a claim under the ADA depending on the severity of the disorder. (See, e.g., *Paleologos v. Rehab Consultants, Inc.* (N.D.Ga. 1998) 990 F.Supp. 1460, 1464; *Sherback v. Wright Automotive Group* (W.D.Pa. 1997) 987 F.Supp. 433, 436.) Wells Fargo presented no evidence in its moving papers concerning Jensen's disability or how it impacted her daily life. Reviewing the statement of undisputed facts and the evidence presented in support of the motion, we learn nothing about the severity of her mental condition other than that it prevents her from working at a branch with the public and with money but does not preclude her from working in a position which does not include those factors. Jensen stated in her declaration that she suffers from anxiety, nervousness, depression, lack of confidence, a helpless feeling, a feeling of humiliation, headaches, teeth grinding, nightmares, sleeplessness, and panic attacks. On these facts, we cannot say that the stress disorder does not meet the definition of disability even were we to apply the stricter ADA test.

The trial court pointed to the fact that Jensen's doctor released her to resume work in a capacity other than in a branch as proof that Jensen's disorder did not substantially limit a major life activity. But if the ability to work in some capacity were the test of covered disability, then no disabled person could ever state a FEHA claim based on failure to accommodate. Given the absence of evidence on the issue of the severity of Jensen's mental disorder, summary judgment should not have been granted on this ground.

## B

### *Regarded as Disabled*

Jensen alternatively contends that her claim should go forward whether or not her disability meets the statutory definition because she was "regarded as disabled" by Wells Fargo when it engaged in efforts to accommodate her. The relevant FEHA definition of an individual regarded as disabled applies only to those who suffer certain specified physical disabilities or those who have a condition with "no present disabling effect" but which "may become a physical disability . . . ." (Gov. Code, § 12926, subd. (k)(3) & (4).) Since Jensen obviously does not meet that definition, she asks us to engraft provisions of the ADA, contending that the Legislature would want the courts to "incorporate[] any provision of the ADA that would result in broader protection of the civil rights of persons with a mental [or] physical disability." As we have said, we do not believe the Legislature intends for us to disregard express definitions in the FEHA which differ from those found in the ADA. In any event, Jensen does not state a claim under the ADA. **(3)** As this court recently recognized in *Real v. City of Compton* (1999) 73

Cal.App.4th 1407 [87 Cal.Rptr.2d 531]: "A person is 'regarded as' disabled [for purposes of the ADA] if: '(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.' [Citation.]" (*Id.* at p. 1416, quoting *Sutton v. United Air Lines, Inc.* (1999) 527 U.S. 471, 489 [119 S.Ct. 2139, 2149-2150, 144 L.Ed.2d 450].)

■ Wells Fargo may well regard Jensen as disabled, since she has repeatedly insisted she is. But regarding an employee as disabled, without more, does not give rise to an employment discrimination claim. As we also said in *Real,* " 'An employer runs afoul of the ADA when it makes an employment decision based on a physical or mental impairment, real or imagined, that is regarded as substantially limiting a major life activity.' [Citation.]" (*Real v. City of Compton, supra,* at p. 1416, quoting *Sutton v. United Air Lines, Inc., supra,* at p. 490.)

Wells Fargo made no employment decision adverse to Jensen based on any perceived disability. It merely attempted to accommodate her after her request. That is not a basis for liability under the regarded as disabled standard.

### C

#### *Reasonable Accommodation*

Wells Fargo sought to establish, through undisputed facts, that it did everything it was required to do under the statute to reasonably accommodate Jensen. Wells Fargo believes it supported this by proving that "[Jensen] was not qualified to continue performing her job or the jobs *she sought.*" (Italics added.) This represents a misunderstanding of both its responsibility as an employer faced with a disabled employee's request for reassignment and its burden as a party moving for summary judgment.

Both of these issues—an employer's obligation once an employee has brought to its attention his or her inability to perform a particular job function due to a covered disability and the burden of proof on an employer moving for summary judgment on a claim of failure to reasonably accommodate a disabled employee—were recently discussed in an in bank decision of the Ninth Circuit in *Barnett v. U.S. Air, Inc.* (9th Cir. 2000) 228 F.3d 1105. The employee in *Barnett,* a warehouse worker, had seriously injured his back and sought accommodation either through purchase of special lifting equipment or reassignment to office work. The employer initially assigned the employee to the mail room after his injury, but then informed

him that other workers with greater seniority were going to be transferred to the mail room positions, and placed him on job injury leave. Later, after filing formal charges of discrimination with the Equal Employment Opportunity Commission (EEOC), the employee received a letter informing him that he could bid for any job within the company which fit his restrictions. The employee brought suit for failure to reasonably accommodate and failure to engage in an interactive process with the goal of finding a reasonable accommodation. The district court granted summary judgment in favor of the employer.

■ The primary issue in *Barnett* was whether the regulatory requirement to engage in an informal, interactive process in order to attempt to identify a reasonable accommodation was mandatory, and whether failure to do so could form an independent basis for a claim under the ADA. The court held that "the interactive process is a mandatory rather than a permissive obligation on the part of employers under the ADA and that this obligation is triggered by an employee or an employee's representative giving notice of the employee's disability and the desire for accommodation." (*Barnett v. U.S. Air, Inc., supra*, 228 F.3d at p. 1114.) The Ninth Circuit explained that "[t]he interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees" with the goal of "identify[ing] an accommodation that allows the employee to perform the job effectively." (*Ibid.*) The court noted that for the process to work "[b]oth sides must communicate directly, exchange essential information and neither side can delay or obstruct the process." (*Id.* at pp. 1114-1115, fn. omitted.) When a claim is brought for failure to reasonably accommodate the claimant's disability, the trial court's ultimate obligation is to " 'isolate the cause of the breakdown . . . and then assign responsibility' so that '[l]iability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown.' [Citation.]" (*Id.* at p. 1115, quoting *Beck v. University of Wis. Bd. of Regents* (7th Cir. 1996) 75 F.3d 1130, 1135-1137.) The court concluded that "an employer cannot prevail at the summary judgment stage if there is a genuine dispute as to whether the employer engaged in good faith in the interactive process." (*Barnett v. U.S. Air, Inc., supra*, 228 F.3d at p. 1116, fn. omitted.)

The employer in *Barnett* argued that the employee should bear the burden of demonstrating the availability of a reasonable accommodation. The court disagreed: "To put the entire burden for finding a reasonable accommodation on the disabled employee or, effectively, to exempt the employer from the process of identifying reasonable accommodations, conflicts with the goals of the ADA. The interactive process is at the heart of the ADA's process and essential to accomplishing its goals. It is the primary vehicle for identifying

and achieving effective adjustments which allow disabled employees to continue working without placing an 'undue burden' on employers. Employees do not have at their disposal the extensive information concerning possible alternative positions or possible accommodations which employers have. Putting the entire burden on the employee to identify a reasonable accommodation risks shutting out many workers simply because they do not have the superior knowledge of the workplace that the employer has." (*Barnett v. U.S. Air, Inc., supra,* 228 F.3d at p. 1113.)

The court in *Barnett* was unimpressed with the employer's purported attempt to accommodate by "offer[ing] that [the employee] could apply for any position for which he was qualified given his restrictions and for which he had sufficient seniority." (*Barnett v. U.S. Air, Inc., supra,* 228 F.3d at p. 1117.) The court specifically held that an offer to bid on other jobs, "a right [the employee] already had," did not represent a reasonable accommodation. (*Ibid.*) "[R]eassignment involves more than a mere opportunity for disabled employees to compete[.]" (*Id.* at p. 1118.) Nor did the court accept the employer's contention that reassignment to the mail room was not an option since it would have required it to make an exception to its seniority policy. Quoting EEOC guidelines, the court concluded that " 'Reassignment means that the employee gets the vacant position if s/he is qualified for it. Otherwise, reassignment would be of little value and would not be implemented as Congress intended.' " (*Ibid.*; accord, *Smith v. Midland Brake, Inc., supra,* 180 F.3d at pp. 1164-1165 ["[I]f the reassignment language merely requires employers to consider on an equal basis with all other applicants an otherwise qualified existing employee with a disability for reassignment to a vacant position, that language would add nothing to the obligation not to discriminate, and would thereby be redundant."]; *AKA v. Washington Hosp. Center, supra,* 156 F.3d at p. 1304 ["[T]he word 'reassign' must mean more than allowing an employee to apply for a job on the same basis as anyone else. An employee who on his own initiative applies for and obtains a job elsewhere in the enterprise would not be described as having been 'reassigned'; the core word 'assign' implies some active effort on the part of the employer." (Fn. omitted.)].)

We recognize that the term "informal, interactive process" is a term utilized by the EEOC in promulgating regulations under the ADA (see 29 C.F.R. § 1630.2(o)(3) (2000)), and that the regulations promulgated under the version of FEHA in effect at the time relevant to the present case do not contain that terminology. (See Cal. Code Regs., tit. 2, § 7293.9 et seq.[6]) Without deciding whether all of the details of the reasonable accommodation process described in the federal regulations apply to claims made

---

[6]Section 7293.9 of title 2 of the California Code of Regulations requires that: "Any employer or other covered entity shall make reasonable accommodation to the disability of

under the FEHA or whether a separate claim exists for failure to engage in the interactive process in good faith,[7] we agree that, assuming the employee is disabled, the employer cannot prevail on summary judgment on a claim of failure to reasonably accommodate unless it establishes through undisputed facts that (1) reasonable accommodation was offered and refused; (2) there simply was no vacant position within the employer's organization for which the disabled employee was qualified and which the disabled employee was capable of performing with or without accommodation; or (3) the employer did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussions in good faith. ■ Reviewing the evidence presented in support of and in opposition to summary judgment, it is evident that a factual dispute exists as to whether Jensen was offered a reasonable accommodation, whether there was any open position within the Wells Fargo organization which could have accommodated her qualifications and limitations, or whether the informal process broke down, and, if so, which party was responsible.

First, the evidence established that Jensen was put on unpaid leave while she collected workers' compensation and long-term disability. Her job was left open for only a short period, but she was told that Wells Fargo would find her a position as branch manager in another location whenever she was ready to come back. Holding a job open for a disabled employee who needs time to recuperate or heal is in itself a form of reasonable accommodation and may be all that is required where it appears likely that the employee will be able to return to an existing position at some time in the foreseeable future. (See, e.g., *Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 226 [87 Cal.Rptr.2d 487].) It is undisputed, however, that both parties

any individual with a disability if the employer or other covered entity knows of the disability, unless the employer or other covered entity can demonstrate that the accommodation would impose an undue hardship." The Code of Regulations gives the following examples of reasonable accommodation: "Reasonable accommodation may, but does not necessarily, include, nor is it limited to, such measures as: [¶] (1) Accessibility. Making existing facilities used by employees readily accessible to and usable by individuals with disabilities; [¶] (2) Job Restructuring. Job restructuring, reassignment to a vacant position, part-time or modified work schedules, acquisition or modification of equipment or devices, adjustment or modification of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar actions." (*Ibid.*)

[7] Wells Fargo does not dispute its obligation to undertake a " 'reasonable effort' to determine an appropriate accommodation, via 'a flexible, interactive process' involving the employer and the disabled employee . . . ." In the recent amendments to FEHA previously discussed, the Legislature expressly "affirm[ed] the importance of the interactive process between the applicant or employee and the employer in determining a reasonable accommodation, as this requirement has been articulated by the Equal Employment Opportunity Commission in its interpretive guidance of the Americans with Disabilities Act of 1990." (Stats. 2000, ch. 1049, § 6; Gov. Code, § 12926.1.)

understood early on that Jensen was unlikely ever to be able to return to branch work. At that point, the focus turned to reassignment to a nonbranch position as the accommodation sought by both sides.

As to whether a reasonable accommodation was ever offered, Dickten-Phillips discussed with Jensen a temporary job and a night job, both situated in El Monte. Jensen was offered the temporary job, and does not dispute that she rejected it. A temporary position is not, however, a reasonable accommodation. It represents, like unpaid leave, a way to put a disabled employee on hold while the attempt to locate a permanent position is ongoing. (See *Champ v. Baltimore County* (D.Md. 1995) 884 F.Supp. 991, 999-1000; *Nguyen v. IBP, Inc.* (D.Kan. 1995) 905 F.Supp. 1471, 1485-1486.) As far as the permanent position in El Monte was concerned, Jensen made clear in her declaration it was never offered. It cannot, therefore, support summary judgment on the basis that Jensen was offered a reasonable accommodation which she refused.

Turning to the question of whether there was an available reassignment, Wells Fargo never attempted to definitively establish that there were no positions within its organization which met Jensen's qualifications and restrictions. Instead, it presented evidence through declarations of its supervisory personnel that, with regard to the positions Jensen located and applied for on her own, she either lacked the required skills or lacked some of the preferred qualifications and that the positions went to others who were better qualified.[8] This begs the question of whether there were other vacant positions within the Wells Fargo organizational structure of which she was unaware or unknowledgeable which might have met her limitations and

---

[8]For the client services representative position, she reputedly lacked "advanced knowledge of Window 3.1/95 and computer hardware"; for the lease services consultant position which was filled "by two internal candidates who were current Wells Fargo employees previously working in the same department," she reputedly lacked "PC/Windows and Kelly Blue Book experience"; for the liquidation specialist position which was filled by "others with qualification more closely matched [to the position's] needs," she reputedly lacked "basic PC, advanced typing and data entry skills"; and for a position in human resources, she reputedly lacked "extensive prior experience in workers compensation . . . ." With regard to positions applied for in loan administration and compliance representative, Wells Fargo submitted excerpts from Jensen's deposition in which she admitted she did not have experience in preparing loan documents and closing of construction and real estate loans or in handling trust regulatory reporting. With regard to a customer service representative position, the supervisor's declaration stated, "While Ms. Jensen did have some of the required skills, she was not hired because she did not have the preferred skills [of] Investment Experience and a College Degree." The position was given "to two people who had college degrees, with the relevant investment experience and who had the additional positive quality of being bilingual."

qualifications.[9] It also represents an improper attempt to shift the entire burden of locating a suitable vacant position to the disabled employee. As the Ninth Circuit said in *Barnett*: "Employees do not have at their disposal the extensive information concerning possible alternative positions or possible accommodations which employers have. Putting the entire burden on the employee to identify a reasonable accommodation risks shutting out many workers simply because they do not have the superior knowledge of the workplace that the employer has." (*Barnett v. U.S. Air, Inc., supra,* 228 F.3d at p. 1113.)

Moreover, to the extent Wells Fargo rejected Jensen for positions for which she was qualified because it had applicants who were more qualified or had seniority, it overlooks that when reassignment of an existing employee is the issue, the disabled employee is entitled to preferential consideration. (*Barnett v. U.S. Air, Inc., supra,* 228 F.3d at p. 1107; *Smith v. Midland Brake, Inc., supra,* 180 F.3d at pp. 1164-1165; *AKA v. Washington Hosp. Center, supra,* 156 F.3d at p. 1304.) Having failed to establish unequivocally that Jensen was unqualified for any vacant position within the organization, summary judgment was inappropriate on this ground.

Finally we look at the facts with regard to whether the breakdown in the informal, interactive process was due to Jensen or Wells Fargo. Wells Fargo contends that it provided "individual attention and assistance in an ongoing job search . . . ." The evidence established that prior to the assignment of the matter to Dickten-Phillips in March 1997, Jensen received some informal assistance from Human Resources Manager Lynn Secrest.[10] Jensen's declaration makes clear that she was expected to identify possible reassignments from Wells Fargo's job listings on her own, and that the company liaisons made little effort to identify which, if any, of the vacant positions met her limitations and qualifications or could be altered to accommodate her. Secrest obtained one interview, for an unposted vacancy in the cash management department, which Jensen was not offered.[11]

Evidence was presented which suggested that Jensen was not fully cooperating with efforts to place her. Although the only actual restrictions clearly

[9]Wells Fargo's own moving papers indicate that there was a position in the Pasadena office which Jensen might have been able to fill, but Dickten-Phillips looked into it and decided against it without consulting Jensen based on Dickten-Phillips's understanding of Jensen's limitations.

[10]Wells Fargo refers in its brief to a third "return to work coordinator," Susan Price. Price was not mentioned in the moving papers, and there was no evidence presented to the trial court concerning the efforts undertaken by Price to assist Jensen in locating a suitable reassignment. Jensen stated in her declaration that she attempted to contact Price several times after receiving notice that her case had been assigned to Price, and never received a return call. We will, therefore, ignore Price for purposes of our analysis.

[11]In a declaration filed in support of the summary judgment motion, Beverly Turner, one of the people who interviewed Jensen for this position, stated: "This position required

identified by the doctors revolved around working in a bank branch, working with the public, and working with money, Dickten-Phillips reported that Jensen kept adding to the list: she could not visit a branch for any period of time, she could not work in sales, she could not work in specific geographic areas, she could not work with strangers, she could not work with or around people who reminded her of the perpetrators, etc. In addition, Dickten-Phillips asserted that Jensen refused to talk to departmental managers regarding her skills and qualifications prior to the existence of an actual opening because "it made her anxious and just got her hopes up."

Jensen admits that she made at least some of these restrictions known to Dickten-Phillips, although she now identifies them as "preferences." This seems to us a distinction without a difference. If these conditions were brought up during the informal, interactive process in which Wells Fargo was engaged in a dialogue in an attempt to identify a suitable reassignment, then Wells Fargo was entitled to consider them restrictions and take them into account in determining whether a suitable opening existed. It is an employee's responsibility to understand his or her own physical or mental condition well enough to present the employer at the earliest opportunity with a concise list of restrictions which must be met to accommodate the employee. As *Barnett* makes clear, it is the responsibility of both sides to keep communications open and neither side has a right to obstruct the process. Jensen could not legitimately refuse to talk to Wells Fargo personnel who were ready to offer assistance in identifying and locating a suitable position whether or not they had a particular opening in mind. For purposes of summary judgment, however, the important point is that Jensen denied including on her list many of the restrictions remembered by Dickten-Phillips and denied that she refused to talk to anyone at Wells Fargo.

On these conflicting and equivocal facts, it cannot be said that Wells Fargo met its burden of establishing the absence of a triable issue of material fact with respect to reasonable accommodation or that Jensen was responsible for the breakdown in the informal, interactive process. It is possible that Jensen was not acting in good faith by adding to her list of restrictions for the purpose of discouraging job offers, or that her list of restrictions was unworkable and that she was simply unqualified for any opening at the bank

intermediate computer knowledge and skills as well as a knowledge of the products and services. We did not accept Ms. Jensen for the position because 1) she did not have the technical computer knowledge and skills required for this job nor the product knowledge; and 2) there were other candidates who were clearly more qualified for the position given their background."

during the period after the robbery which met her restrictions and qualifications.[12] But Wells Fargo did not establish that there were no disputed facts concerning these points, and, as the moving party, failed to meet its burden to establish a right to summary judgment on the FEHA claim.

## II, III*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is reversed in part and affirmed in part. The matter is remanded to the trial court for further proceedings on the FEHA claim. Costs on appeal are awarded to appellant.

Epstein, Acting P. J., and Hastings, J., concurred.

A petition for a rehearing was denied December 28, 2000, and respondent's petition for review by the Supreme Court was denied March 14, 2001. Baxter, J., did not participate therein. Chin, J., and Brown, J., were of the opinion that the petition should be granted.

---

[12]For example, Jensen stated that she panicked when she happened to see an African-American computer repairman because he reminded her of the robbers and that she is susceptible to panic attacks whenever she is around African-Americans who remind her of her attackers. An employer is not required to potentially offend other members of its staff in order to accommodate an irrational fear.

*See footnote, *ante*, page. 245.