Filed 3/2/22  Casas v. County of L.A. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| CRUZ CASAS,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>THE COUNTY OF LOS ANGELES,<br><br>    Defendant and Respondent. | B304609<br><br>(Los Angeles County Super. Ct. No. BC698745) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert S. Draper, Judge.  Affirmed.

McNicholas & McNicholas, Douglas D. Winter and Jeffrey R. Lamb for Plaintiff and Appellant.

Peterson Bradford Burkwitz, Avi Burkwitz and Bryan J. Su for Defendant and Respondent.

\* \* \* \* \* \*

Cruz Casas (appellant) appeals from a judgment entered after the trial court granted summary judgment in favor of respondent County of Los Angeles and the Los Angeles County Sheriff's Department (county or respondent) on appellant's claims against the county for violations of the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.). We find that appellant failed to establish a prima facie case for each of the four causes of action he brought against the county. Therefore, we affirm the judgment.

## FACTUAL BACKGROUND

**Appellant's employment with the county**

Appellant has been an employee of the county since 1999. Appellant began his employment at the rank of deputy sheriff. In 2006, appellant applied to become a bonus deputy, a "coveted position." Appellant became a bonus deputy effective January 1, 2008, and was assigned as a supervising line deputy at Twin Towers Correctional Facility (TTCF).

Appellant was promoted to sergeant in April 2016. After attending sergeant school, appellant was assigned to Men's Central Jail (MCJ) on a probational basis. Included as part of his duties was the review of use of force documents prepared by deputies to ensure accuracy.

**Incidents with Lt. Subler**

Lt. Donald Subler was one of appellant's supervisors at MCJ. They worked together a few days out of the week. Appellant also worked with Sgt. Edward Colton.

Though appellant's relationship with Lt. Subler was mostly professional, appellant identified two negative incidents with Lt. Subler.

In May 2016, appellant responded to a "man down" call for an inmate experiencing medical issues. When he arrived at the scene, appellant observed three to four deputies and a nurse assisting the inmate. Within seconds of appellant's arrival at the scene Lt. Subler called over the radio to inquire about the status of the man down. Appellant instructed the deputies to respond to Lt. Subler and let him know that a nurse was attending to the inmate. After the incident Lt. Subler ordered appellant and the other deputies to see him for a debriefing. Lt. Subler appeared agitated and raised his voice at the deputies for not updating him more quickly about the status of the man down. When appellant started walking towards his office Lt. Subler followed right behind him. As soon as he entered appellant's office, Lt. Subler placed his finger inches from appellant's nose and threatened, "Don't you ever take the side of a deputy."

The second incident occurred on June 5, 2016. Lt. Subler called appellant into his office to discuss appellant's "use of force packet," which Lt. Subler considered to be substandard. Lt. Subler yelled at appellant, stating, "this is dog shit. You don't know what you're doing. You're failing the deputies." When appellant informed Lt. Subler that it was the first use of force packet he had ever filled out, Lt. Subler shouted, "I don't care if it's the first one or your hundredth—it's dog shit." Lt. Subler then continued to scream at appellant and verbally berate him.

As Lt. Subler continued to berate appellant, appellant felt his face and arms go numb. His mouth became dry, and he began sweating profusely. Appellant believed he was having a heart attack. Appellant took the papers from Lt. Subler's desk and attempted to leave, but Lt. Subler yelled at appellant to come back because he was not finished. Lt. Subler continued to raise

his voice and criticize appellant's use of force packet. When appellant left Lt. Subler's office he believed he had defecated himself.

After the incident appellant saw Sgt. Colton. Upon seeing appellant's face, Sgt. Colton asked, "Hey, what happened?" Appellant related the incident with Lt. Subler and stated that he was considering voluntary demotion. He said, "I don't need this. I don't need this abuse. I'm going back to where I came from. I don't need this." Sgt. Colton said, "No, don't do it. Don't demote. You earned it. You passed the test. You earned it. Don't demote. We're going to go talk to him at the end of the day."

At the end of the day Sgt. Colton walked to Lt. Subler's office and went inside. A few minutes later, Lt. Subler came out and invited appellant in. Lt. Subler stated, "I'm sorry about the way I talked to you. I want nothing, but the best for you. If you need help, you can always come to me." Appellant was still upset, so he shook his head and repeated "okay, okay, okay."[1]

Later that same day Lt. Subler told appellant that he had his opinion about appellant from the first day he met him. Lt. Subler said his opinion was based on his belief that appellant was "talking shit" about other sergeants. Appellant did not sleep that night. The next day appellant drove himself to Kaiser and saw a doctor, who informed appellant that he had a panic attack. The doctor excused appellant from work for three days. Eventually appellant was taken off of work for nine months on temporary totally disabled status based on this incident.

---

[1] Appellant later admitted that use of force packets must be accurate, and all involved, from deputies to supervisors, are obliged to ensure accuracy in the packages.

4

Appellant was neither disciplined nor suspended during those nine months.

**Appellant's report and accommodation attempts**

On June 14, 2016, appellant reported Lt. Subler's conduct to the policy of equality office. Appellant stated that "he would like to be transferred out to another custody facility or he will self-demote." The incident was reported to Lt. Stacy Morgan, Lt. Subler's supervisor and the operations lieutenant at MCJ. Both Lt. Morgan and Cpt. Joseph Dempsey, Lt. Morgan's supervisor, reached out to appellant.

Appellant acknowledges receiving a phone call from Lt. Morgan around June 20, 2016.[2] However, there is conflicting evidence as to the content of this phone call. Lt. Morgan reported that she offered appellant numerous support programs, including: placing appellant on a different shift and floor than Lt. Subler; providing appellant with an official mentor working the same shifts as appellant; providing appellant opportunities to train with the MCJ training unit to help learn how to deal with common incidents; providing appellant the opportunity to work with MCJ compliance unit for training in how to prepare use of force packets; providing appellant with conflict resolution, union or attorney representation; and providing appellant with the telephone number for employee support services. Lt. Morgan testified that in response to her offers, appellant responded that he wanted to be transferred back to TTCF as sergeant. He stated that he would "like to restore his prior position as a Bonus

---

[2] Appellant's declaration states that the phone call took place on or around June 20, 2018. However, read in context, it is apparent that this is a typographical error, and the phone call took place on or around June 20, 2016.

Deputy or transfer to TTCF." Lt. Morgan stated that at the close of the phone call she informed appellant that she would "look into and evaluate what moves were possible by Department policy and get back to him."

Appellant, on the other hand, recalled a much shorter phone call with Lt. Morgan. He described the call as lasting "between thirty seconds and two minutes." Appellant stated that Lt. Morgan asked him if he planned on demoting. Appellant denied that Lt. Morgan offered any of the options she attested to offering. Appellant further denied that he told her that he wanted to return to TTCF or demote to his prior position as a bonus deputy.

Cpt. Dempsey spoke with Lt. Subler about the incident. Lt. Subler admitted to using profanity during the encounter. As a result, Cpt. Dempsey instructed Lt. Morgan to write a performance log entry on Lt. Subler for his behavior. Cpt. Dempsey counseled Lt. Subler for this behavior verbally as well as in writing. Lt. Subler was transferred out of MCJ in August 2016.

On June 17, 2016, Lt. Morgan reported that both she and Cpt. Dempsey had reached out to appellant, who was planning on seeing his own psychologist on June 28, 2016. At that time, appellant would "determine if he is going to remain a sergeant at MCJ or demote to deputy." Appellant stated that he "was not interested in conflict resolution and did not want any contact with [Lt.] Subler."

**The county's relevant policies and Lt. Morgan's followup with appellant**

Lt. Morgan determined that neither of appellant's requested moves—a transfer as sergeant to another facility or

6

demotion to bonus deputy—were permitted based on several of the county's policies.

Los Angeles County, Civil Service Rules, rule 12.01 requires that an employee appointed to a permanent position serve a probation period before the appointment is complete. (L.A. County Code, tit.5, appen. 1.) The probationary term must be for at least six months. This policy ensures that employees obtain a wide variety of experience and ensures that facilities are adequately staffed. Many facilities, including MCJ, suffer from a shortage of personnel. Appellant's probationary term at MCJ was six months. Appellant was promoted to sergeant and assigned to MCJ in April 2016 and had not completed his probation when he went on leave in June 2016. Therefore, transfer to another facility as sergeant was not permissible until appellant completed his probationary period.

A second policy, found in the county's manual of policy and procedures (MPP), section 3-02/010.39, mandates that all employees at the rank of lieutenant and below remain at a unit of assignment for one year before a transfer request may be granted.

The above restrictions may be lifted if an employee files a hardship request memorandum in writing.[3] Absent a hardship request, the above policies must be followed. Appellant was aware of these general policies, and that there are certain

---

[3] While it is not completely clear from the evidence whether the hardship request may excuse an employee from both the six-month probationary period and the one-year limitation on transfers, the parties imply that a hardship request may be made to excuse an employee from either restriction.

circumstances that allow an individual to transfer, including a hardship such as a medical condition.

Finally, the Bureau of Labor Relations and Compliance (BOLRAC) Coveted Positions Selection Procedures, paragraphs C and H, require that any appointment to a bonus or coveted position must be made from an eligibility list for the testing of deputy generalists (the rank below bonus deputy.) This policy prevented appellant from demoting directly to bonus deputy or returning directly to a coveted position. Once an employee is promoted from a bonus or coveted position to sergeant, BOLRAC mandates that the employee's name be taken off the eligibility list. The policy is in place to ensure that employees in bonus or coveted positions are qualified per updated testing requirements and that appointments are made in a fair manner. Appellant was aware that the only way to become a bonus deputy was to go through the testing process from the rank of deputy generalist.

The above policies apply to all county employees regardless of their disability or probationary status.

Lt. Morgan spoke with appellant a second time in August 2016. She informed him that his requests to transfer or demote to bonus deputy were not possible based on county policy. She further informed him that his only options were to demote to deputy generalist so that he could test into the bonus deputy position or remain at MCJ, where the unit would work with him to help him succeed in his role. Despite Lt. Morgan's offers, appellant did not alter his demands of lateral transfer or restoration to bonus deputy. Appellant denies that this second conversation occurred. Appellant states that after the first phone call, Lt. Morgan never called him again.

8

**Appellant's leave and work restriction**

On June 28, 2016, appellant had to return to MCJ to sign a probation extension form. When he entered MCJ, he began to get extremely anxious. He thought he was going to have another panic attack. His anxiety was not personal to Lt. Subler, whom he did not see that day. Appellant quickly signed the form and left.

Around August 2016, appellant began participating in individual psychotherapy once a week with Dr. Halote. In July 2019, appellant testified in deposition that he was unaware of whether Dr. Halote ever diagnosed him with anything. However, in October 2019 appellant stated in a declaration that Dr. Halote informed appellant that he was suffering from acute stress disorder and adjustment disorder. Dr. Halote placed appellant off work until January 2017. Appellant confirmed that the incident with Lt. Subler was the sole reason that he missed nine months of work. Appellant recalled telling Dr. Halote that he did not want to go back to work at MCJ, and the main reason was that Lt. Subler was there. Appellant never told Dr. Halote that Lt. Subler had been transferred out of MCJ.

On January 5, 2017, Dr. Halote cleared appellant to return to work with the following restriction: "Has to work in a different facility other than where injury occurred." Appellant promptly faxed the restriction to MCJ.

On January 17, 2017, appellant e-mailed Martha Garcia, who worked in the county's Injury and Health Support Unit, and noted that he had spoken to her last week about a possible transfer from MCJ to a different facility per his doctor's recommendations. Appellant further noted that he had an appointment with his doctor the following day and hoped to be

9

cleared to return to work. Appellant inquired, "Do you know if I will be allowed to go to CRDF[4], IRC[5] or TTCF?"

Dr. Halote described the onset of appellant's "injury/illness" as "stress and strain at work due to an interpersonal conflict with a supervisor." On January 18, 2017, Dr. Halote stated that appellant was "doing a lot better, though he still experiences some anxiety. [Appellant] is able to function close to before the incident, some issues with returning under the same facility. Adjustment disorder with mixed anxiety and depressed mood mostly resolved." Dr. Halote provided no current unresolved diagnosis or disability.

**Appellant's return to work**

On January 17, 2017, appellant was told by Garcia that appellant was to return to MCJ on January 23, 2017, to meet with Cpt. Dempsey to discuss appellant's work restrictions.

On January 23, 2017, appellant met with Cpt. Dempsey, Cpt. Del Valle, and Lt. Murphey.[6] Cpt. Dempsey informed appellant that Lt. Subler had been transferred out of MCJ. Appellant testified that the meeting lasted only 15 to 30 minutes, and as soon as the meeting began Cpt. Dempsey announced that the county would not accommodate appellant's work restriction. Instead, Cpt. Dempsey stated that appellant could "demote, retire, or remain" at MCJ as a sergeant. Appellant stated that he informed Cpt. Dempsey that he did not want to demote as he had worked hard to attain the position of Sergeant. He did not want

---

4       Century Regional Detention Facility.

5       Inmate Reception Center.

6       Lt. Morgan transferred out of MCJ in September or October 2016.

10

to retire because he had not worked for the county for 30 years yet, which was his intention. However, appellant informed Cpt. Dempsey that remaining at MCJ was not an option for him because it would be in violation of his medical restriction. Cpt. Dempsey asked appellant, "How do I know you didn't tell your doctor what to write?"

Cpt. Dempsey testified that he explained to appellant that transfer as sergeant to another facility was not an option as appellant had not submitted a hardship memorandum. Cpt. Dempsey also explained why restoration to the position of bonus deputy was not an option. Cpt. Dempsey informed appellant that Lt. Subler was no longer working at MCJ[7] and offered him three options: to remain at MCJ and complete his probation; to transfer to another facility as deputy generalist; or to apply for service-connected disability retirement. Cpt. Dempsey informed appellant that he preferred appellant stay at MCJ. Cpt. Dempsey offered support services to appellant to overcome his anxiety and stress, as well as an official mentor that would be assigned the same work dates and shifts as appellant.[8] Appellant opted to voluntarily restore to deputy generalist at another facility

---

[7]     Lt. Subler had been transferred to IRC.

[8]     Appellant disputes Cpt. Dempsey's description of the meeting. Appellant stated that Cpt. Dempsey did not offer him support services or offer to provide him with an official mentor. Appellant stated that Cpt. Dempsey did not inform appellant that he preferred that appellant stay at MCJ, nor did he explain why he could not be accommodated by moving to another facility.

11

**The county's accommodation policy**

The county's MPP, section 3-02/040.40, which was in effect at the time of the January 2017 meeting between Cpt. Dempsey and appellant, is captioned "Return to Work—Sworn Members—Medical Restrictions." The policy provides that "[t]he following process shall be complied with for the return to work of Department members with work restrictions." When the return-to-work unit receives medical restrictions, the return-to-work coordinator must review the work restrictions to determine whether the employee may return to his assignment. However, if the work restrictions preclude the employee from returning to his usual and customary duties, the return-to-work coordinator must begin to develop alternative return-to-work placement. The return-to-work coordinator will supply a "Request for Reasonable Accommodations" form for the employee to fill out. If the employee's requested accommodations can be met, the employee will return to work. If the requested accommodations cannot be met in the employee's current unit, alternative placement within the employee's division will be sought. If the restrictions prevent an employee from being placed back in his division, alternative placement throughout the county will be sought. Should an employee not be able to return to work for the county, release or retirement options will be explored.

Cpt. Dempsey participated in discussions with Garcia of the return-to-work department regarding appellant's work restriction. His understanding was that they had to come up with reasonable accommodations for appellant. Cpt. Dempsey informed appellant that he would need to seek a hardship transfer if he wanted to transfer out of MCJ at his rank of sergeant. While Cpt. Dempsey did not believe a hardship

12

transfer would be granted, the decision was not within Cpt. Dempsey's authority. In order to accommodate appellant's work restriction as appellant desired, Cpt. Dempsey needed to have a hardship transfer put in place.

**Appellant's demotion and subsequent assignments**

Appellant elected not to complete his probationary term at MCJ despite Lt. Subler's transfer from the facility. Appellant voluntarily demoted to the rank of deputy generalist and transferred to CRDF in April 2017.

In February 2017, appellant refused to sign a document captioned "Request for Voluntary Demotion." On March 7, 2017, appellant signed a document captioned "Demotion." The document stated, "I will accept the demotion from my current position of Sergeant to Deputy Sheriff . . . in order to transfer to CDRF [*sic*]."[9]

In April 2017, appellant submitted a restriction limiting the number of hours he could work for his first two weeks at CRDF. Appellant accepted an accommodation limiting the number of hours he could work to 40 hours per week.

Appellant later transferred to the court services division, which he loves. However, appellant believes he has been negatively affected by the refusal of the county to make his specific requested accommodation. He claims to have lost a significant amount of money in salary, overtime, and opportunities to continue promoting.

---

[9] The portion of this document left blank with ellipses is illegible.

13

## PROCEDURAL HISTORY

### I.    Appellant's complaint

Appellant filed his complaint against the county on March 21, 2018.  The complaint contained four causes of action: (1) failure to engage in the interactive process in violation of FEHA (Gov. Code, § 12940, subd. (n)), (2) failure to accommodate in violation of FEHA (Gov. Code, § 12940, subd. (m)), (3) discrimination in violation of FEHA (Gov. Code, § 12940 et seq.), and (4) retaliation in violation of FEHA (Gov. Code, § 12940 et seq.).  On April 19, 2018, the county filed its answer.

### II.    Summary judgment proceedings

On July 19, 2019, the county filed its motion for summary judgment or, in the alternative, summary adjudication (MSJ).  With respect to appellant's first cause of action for failure to engage in good faith interactive process, the county claimed appellant did not have a qualifying disability, refused to engage in the interactive process, and that the county did engage in the interactive process.  As to appellant's second cause of action for failure to reasonably accommodate, the county's position was that appellant did not have a qualifying disability and that the county did provide reasonable accommodations for his work restrictions.  As to appellant's third cause of action for disability discrimination, the county argued that appellant did not have a qualifying disability, did not suffer an adverse employment action, the county had no discriminatory motive, and its actions were based on legitimate reasons.  Finally, as to appellant's fourth cause of action for retaliation, the county argued that appellant did not have a qualifying disability; suffered no adverse employment action; and that the county had legitimate, nonretaliatory reasons for its actions.

14

Appellant opposed the county's motion, asserting that there were triable issues as to each cause of action. Appellant claimed to have suffered from a disability under FEHA because he was diagnosed with suffering a panic attack and resulting acute stress disorder and adjustment disorder. Appellant argued that the disability limited a major life activity as it prevented him from working. In addition, appellant argued the county regarded appellant as suffering from a disability. Appellant argued that he was subjected to an adverse employment action because he did not voluntarily demote—instead, he was told that he could either (1) violate his work restriction and jeopardize his health or (2) demote. Appellant argued that this was not a real choice.

Appellant stated his position that it was the county that refused to engage in the interactive process, not appellant; thus triable issues of fact remained as to the failure to engage in the interactive process claim. Finally, appellant argued that the county's position that appellant had to demote in order to be transferred was not a good faith effort to reasonably accommodate appellant. Thus, appellant argued, triable issues of fact remained as to the failure to accommodate claim.

The county filed a reply on October 24, 2019, where it reiterated its position that appellant had failed to state a prima facie case for any of his four causes of action.

### III. The trial court's ruling

The court held oral argument on November 19, 2019. At the conclusion of the hearing the trial court adopted its tentative judgment granting the MSJ.

The trial court issued a written decision the same day. As to the FEHA discrimination claim, the court held that appellant admitted during discovery that he was unaware if he had been

15

diagnosed with a FEHA-recognized disability and provided no evidence, other than his own contradictory declaration, of such a disability.  Further, the trial court found that pursuant to *Higgins-Williams v. Sutter Medical Foundation* (2015) 237 Cal.App.4th 78, 85 (*Higgins-Williams*), an individual's inability to work under particular supervisors due to anxiety and stress related to standard oversight of his or her performance does not rise to the level of a FEHA-recognized disability.  Accordingly, the trial court found that appellant failed to establish that he had a FEHA-recognized disability.

The trial court considered the failure to engage in good faith interactive process and failure to accommodate causes of action together.  The trial court acknowledged that an individual need not necessarily have a FEHA-recognized disability in order to prevail on a claim for failure to engage in the interactive process.  (Citing *Moore v. Regents of University of California* (2016) 248 Cal.App.4th 216, 243.)  However, to prevail on a claim for failure to engage in the interactive process, an individual must "identify a reasonable accommodation that would have been available at the time the interactive process should have occurred."  (Quoting *Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1018 (*Scotch*).)  Further, the trial court noted that an employer does not violate the duty to engage in an interactive process by simply denying an employee's request.  (Citing *id.* at p. 1019).  Appellant did not identify another accommodation that the county could have offered him other than allowing him to transfer with his title, and appellant admittedly did not submit a hardship memorandum.  Under the circumstances, the county carried its burden of showing that it

16

engaged in the interactive process and reasonably accommodated appellant to the extent required by law.

As to appellant's FEHA retaliation claim, the trial court held that given the county's offer to appellant that he could retain his former position and title without Lt. Subler working on the premises, appellant did not suffer an adverse employment action. Because Lt. Subler no longer worked at the site, the county's offer to appellant that he return to his prior position was reasonable as a matter of law.

Accordingly the trial court granted the MSJ in full. Judgment was entered on January 2, 2020.

## IV. Notice of appeal

On February 28, 2020, appellant filed his notice of appeal from the judgment.

## DISCUSSION

## I. Standard of review for summary judgment ruling

A trial court may grant summary judgment if the papers submitted by the moving party show that there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) The moving party is entitled to judgment in its favor if it can demonstrate that one or more elements of a cause of action cannot be established, or that it has an affirmative defense to that cause of action. (Code Civ. Proc., § 437c, subd. (*o*).)

A trial court's decision on a summary judgment motion is reviewed de novo. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142.) The appellate court is guided by the same principles applicable at the trial court level. First, ""we identify the issues framed by the pleadings since it is these

17

allegations to which the motion must respond . . . . [¶] Secondly, we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in movant's favor. . . . [¶] When a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue."'"'" (*Hamburg v. Wal-Mart Stores, Inc.* (2004) 116 Cal.App.4th 497, 503.) In undertaking this analysis, we must view the evidence submitted in opposition to the motion in the light most favorable to the party against whom summary judgment was entered. All doubts about granting the motion must be resolved in favor of its denial. (*Asplund v. Selected Investments in Financial Equities, Inc.* (2000) 86 Cal.App.4th 26, 36-37.) However, where there has been a clear and unequivocal admission by a plaintiff in discovery, a court may determine that a later contradictory statement does not constitute substantial evidence nor create a triable issue of fact. (*King v. Andersen* (1966) 242 Cal.App.2d 606, 610; see *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 22.)

## II.   FEHA disability discrimination

### A.   *Governing law*

For appellant's FEHA discrimination and retaliation claims, we apply the three-step burden-shifting analysis established in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 (*McDonnell Douglas*). (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354-356 (*Guz*).) "This so-called *McDonnell Douglas* test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be

18

inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." (*Id.* at p. 354.)

Initially the *McDonnell Douglas* test places on the plaintiff the burden of establishing a prima facie case of discrimination or retaliation. The plaintiff's prima facie burden is "'not onerous,'" but he must at least show "'"actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a [prohibited] discriminatory criterion . . . .'"'" (*Guz, supra*, 24 Cal.4th at p. 355.)

If the plaintiff establishes a prima facie case, a presumption of discrimination arises. (*Guz, supra*, 24 Cal.4th at p. 355.) The burden then shifts to the employer to rebut the presumption by producing admissible evidence, sufficient to raise a genuine issue of fact, that its actions were taken for a legitimate, nondiscriminatory reason. "If the employer sustains this burden, the presumption of discrimination disappears." (*Id.* at p. 356.) The plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for discrimination. (*Ibid.*)

To make a prima facie showing of disability discrimination, a plaintiff must generally show that (1) he suffered from a disability; (2) he was otherwise qualified for the position he held; and (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job because of his disability. (*Faust v. California Portland Cement Co.* (2007) 150 Cal.App.4th 864, 886.)

In its MSJ, the county addressed the first and third elements of disability discrimination. We address only the third element below and conclude that appellant failed to meet his

19

burden of establishing a prima facie case of disability discrimination because he failed to show that he suffered an adverse employment action as a matter of law.

### B. *Adverse employment action*

An "adverse employment action" is one that "materially affects the terms, conditions, or privileges of employment." (*McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 386 (*McRae*).) "'A change that is merely contrary to the employee's interests or not to the employee's liking is insufficient.'" (*Ibid.*) "'[T]he determination of whether a particular action or course of conduct rises to the level of actionable conduct should take into account the unique circumstances of the affected employee as well as the workplace context of the claim.'" (*Whitehall v. County of San Bernardino* (2017) 17 Cal.App.5th 352, 367.)

In this case, appellant was offered his exact same rank and position at MCJ upon his return to work, without the presence of Lt. Subler, who had been transferred. This does not constitute an adverse employment action as a matter of law. (*McRae, supra*, 142 Cal.App.4th at p. 393 [return to work in "a comparable position" is generally not an adverse employment action].) Despite the county's offer that appellant return to work in his same rank and assignment without Lt. Subler as supervisor, appellant refused. Under the circumstances appellant's decision to demote was voluntary. Appellant's choice to demote and transfer instead of remaining at his previous position, free from the presence of the supervisor who induced his stress, cannot be characterized as an adverse employment action.

Appellant emphasizes that he was cleared to return to work with a restriction that he not be placed back at MCJ, but at

another facility. Appellant argues that he was not willing to risk his own health by returning to MCJ in violation of his doctor's orders. Therefore, appellant desired a transfer from MCJ at his same rank of sergeant. However, an employer is not required to grant an individual's preferred accommodation under the law. (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1194 (*Wilson*) ["'"[A]n employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided."'"'].) The county had numerous reasons, set forth in the policies described above, not to permit appellant the precise accommodation that he desired. Appellant also undermined his own request for a lateral transfer by failing to submit a hardship memorandum. It is impossible to speculate the outcome of such a hardship request because appellant never completed this required task.

Further, there was evidence that appellant's doctor was unaware that Lt. Subler had left MCJ. There is no way of knowing whether the doctor would have requested the same restriction had he known this relevant fact.

Taking into account appellant's unique circumstances, as well as the workplace context of the claim, we find that appellant did not suffer an adverse employment action as a matter of law. (*Whitehall v. County of San Bernardino, supra*, 17 Cal.App.5th at p. 367.) Thus, the trial court properly granted summary judgment on appellant's disability discrimination cause of action.[10]

---

[10] Our decision that appellant did not suffer an adverse employment action as a matter of law disposes of appellant's disability discrimination cause of action. Therefore, we need not

## III.  FEHA retaliation

Government Code section 12940, subdivision (h) provides that it is unlawful for an employer to discriminate against an employee because he or she has "opposed any practices forbidden under this part."  In addition to these protections, Government Code section 12940, subdivision (m)(2) provides that it is unlawful for an employer to "retaliate or otherwise discriminate against a person for requesting accommodation under this subdivision, regardless of whether the request was granted."

To establish a prima facie case of retaliation under FEHA, a plaintiff must show (1) he or she engaged in protected activity; (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action.  (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.)

As described above, appellant did not suffer an adverse employment action as a matter of law.  Appellant has not established a prima facie case of retaliation as a matter of law, and the trial court properly granted summary judgment as to this cause of action.

## IV.  Failure to reasonably accommodate

### A.  *Governing law*

Appellant's failure to accommodate claim is based on Government Code section 12940, subdivision (m), which makes it an unlawful practice to "fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee."  To prevail on a claim for failure to reasonably

---

address the issue of whether appellant had a recognized disability under FEHA, and we decline to do so.

accommodate, a plaintiff is required to show "(1) the plaintiff has a disability covered by the FEHA; (2) the plaintiff is a qualified individual (i.e., he or she can perform the essential functions of the position); and (3) the employer failed to reasonably accommodate the plaintiff's disability." (*Wilson, supra*, 169 Cal.App.4th at p. 1192 (*Wilson*).)

The burden is on an employer who knows of the disability of an employee to "make known to the employee other suitable job opportunities with the employer and to determine whether the employee is interested in, and qualified for, those positions." (*Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 950-951.) However, an employer "is not required to choose the best accommodation or the specific accommodation the employee seeks." (*Wilson, supra,* 169 Cal.App.4th at p. 1194.) ""[A]n employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided.""" (*Ibid.*)

An employer cannot prevail on summary judgment on a claim of failure to reasonably accommodate unless it can show that "(1) reasonable accommodation was offered and refused; (2) there simply was no vacant position within the employer's organization for which the disabled employee was qualified and which the disabled employee was capable of performing with or without accommodation; or (3) the employer did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussions in good faith." (*Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 263 (*Jensen*).)

**B.** *The county provided reasonable accommodation as a matter of law*

In this matter, the county offered appellant his former position, with the same rank and pay, without the presence of the supervisor who had caused his stress. While this was not the precise accommodation that appellant desired, it was a reasonable accommodation. Appellant refused this offer. Therefore, the county was entitled to summary judgment on this cause of action. (*Jensen, supra*, 85 Cal.App.4th at p. 263.)

Appellant focuses solely on the specific accommodation that he desired—to be transferred to another position at the rank of sergeant. However, the county was not required to offer appellant the specific accommodation he sought. (*Wilson, supra*, 169 Cal.App.4th at p. 1194.) The county presented undisputed evidence that appellant's requested accommodation was prohibited by several policies of the department that are in place to ensure fair and reasonable employment practices.

The county's offer that appellant return to his previous position, without the presence of Lt. Subler at the facility, was a reasonable accommodation as a matter of law. The trial court properly granted summary judgment on this cause of action.

**V.** **Failure to engage in the interactive process**

**A.** *Governing law*

Under Government Code section 12940, subdivision (n) it is separately actionable for an employer to "fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition." "[A]n employer's failure to properly

24

engage in the process is separate from the failure to reasonably accommodate an employee's disability and gives rise to an independent cause of action [citation]." (*Swanson v. Morongo Unified School Dist.* (2014) 232 Cal.App.4th 954, 971.) Responsibility for a breakdown in the interactive process lies with the party who fails to participate in good faith. (*Jensen, supra*, 85 Cal.App.4th at p. 266.) In order to recover under Government Code section 12940, subdivision (n), an employee "must identify a reasonable accommodation that was available at the time the interactive process should have occurred." (*Scotch, supra*, 173 Cal.App.4th at p. 995.)

**B.** ***The trial court properly granted summary judgment on the failure to engage cause of action***

Appellant has not identified a specific reasonable accommodation that was available at the time that the interactive process should have occurred. (*Scotch, supra*, 173 Cal.App.4th at p. 995.) Appellant sought to retain his title and be granted a transfer, although he had not yet completed his required probationary period. That specific accommodation was not available, as it was prohibited by various county policies.

Further, appellant did not take the necessary step to be granted such a transfer. Appellant was aware that there existed a process through which he could seek a hardship transfer prior to the end of his probationary period and still retain the same rank. Appellant needed to apply for such a transfer in writing, and Cpt. Dempsey was not authorized to make the determination. Although appellant was aware of this process, he did not apply for a hardship transfer. Under the circumstances, appellant exhibited a lack of good faith by refusing to attempt a

25

hardship transfer then blaming the county for not granting him such a transfer. Thus, responsibility for the breakdown lies with appellant. (*Jensen, supra*, 85 Cal.App.4th at p. 266.) If appellant wanted a transfer at his rank without completing his probationary period, he had a responsibility to take the steps necessary to accomplish such a transfer.

Because appellant did not identify a reasonable available accommodation, and did not take the necessary step to achieve the accommodation he desired, the breakdown in the process lies with appellant. The trial court properly granted summary judgment on this cause of action.

## DISPOSITION

The judgment is affirmed.

_____
CHAVEZ, J.

We concur:


_____
LUI, P. J.


_____
HOFFSTADT, J.